## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

——————

No. 08-51185

——————

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 6, 2012

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

versus

ANTHONY JAMES KEBODEAUX, Also Known as Anthony Kebodeaux,

                              Defendant-Appellant.

——————

Appeal from the United States District Court
for the Western District of Texas

——————

Before JONES, Chief Judge, KING, JOLLY, DAVIS, SMITH, GARZA,
BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO, OWEN, ELROD,
SOUTHWICK, HAYNES, and GRAVES, Circuit Judges.[*]

JERRY E. SMITH, Circuit Judge:

    Anthony Kebodeaux, a federal sex offender, was convicted, under the Sex
Offender Registration and Notification Act ("SORNA"), of failing to update his

——————

[*] Judge Higginson was not a member of the court when this case was submitted to the
court en banc and did not participate in this decision.

No. 08-51185

change of address when he moved intrastate.  A panel of this court affirmed. *United States v. Kebodeaux*, 647 F.3d 137 (5th Cir. 2011).  The panel majority rejected Kebodeaux's argument that Congress does not have the power to criminalize his failure to register because it cannot constitutionally reassert jurisdiction over his intrastate activities after his unconditional release from federal custody. Judge Dennis concurred in the judgment and assigned lengthy reasons, urging that SORNA is authorized by the Commerce Clause.  The panel opinion was vacated by our decision to rehear the case en banc.  *United States v. Kebodeaux*, 647 F. 3d 605 (5th Cir. 2011).  Because we agree with Kebodeaux that, under the specific and limited facts of this case, his commission of a federal crime is an insufficient basis for Congress to assert unending criminal authority over him, we reverse and render a judgment of dismissal.

## I.

While in the military, Kebodeaux had consensual sex with a fifteen-year-old when he was twenty-one and was sentenced in 1999 to three months in prison.  He fully served that sentence, and the federal government severed all ties with him.  He was no longer in federal custody, in the military, under any sort of supervised release or parole, or in any other special relationship with the federal government when Congress enacted a statute that, as interpreted by the Attorney General, required Kebodeaux to register as a sex offender.[1]  When he

---

[1] *See* 42 U.S.C. § 16913 (2006) (requiring a sex offender to register in each jurisdiction in which he resides and to update that registration); 28 C.F.R. § 72.3 (2007) (specifying that § 16913's requirements apply to all sex offenders, "including sex offenders convicted of the offense for which registration is required prior to the enactment of [§ 16913]").  Because Kebodeaux committed his offense before SORNA's passage, his duty to register comes from the Attorney General's regulation rather than the statute itself.  *Reynolds v. United States*, 132 S. Ct. 975, 984 (2012).  Despite the fact that the Attorney General did not follow the procedures laid out in the Administrative Procedure Act when issuing the regulation, we found that to be harmless error as applied to a defendant who had moved interstate but was otherwise

(continued...)

2

No. 08-51185

failed to update his state registration within three days of moving from San Antonio to El Paso, he was convicted under 18 U.S.C. § 2250(a) (also enacted in 2006) and sentenced to a year and a day in prison.

Kebodeaux argues that § 2250(a)(2)(A) and the registration requirements that it enforces are unconstitutional as applied to him, because they exceed the constitutional powers of the United States. He is correct: Absent some jurisdictional hook not present here, Congress has no Article I power to require a former federal sex offender to register an intrastate change of address after he has served his sentence and has already been unconditionally released from prison and the military.[2]

The federal requirement that sex offenders register their address is unconstitutional on narrow grounds. We do not call into question Congress's ability to impose conditions on a prisoner's release from custody, including requirements that sex offenders register intrastate changes of address after release. *After* the federal government has *unconditionally* let a person free, however, the fact that he once committed a crime is not a jurisdictional basis for subsequent regulation and possible criminal prosecution. Some other jurisdictional ground, such as interstate travel, is required.[3]

---

[1] (...continued)
in substantially the same situation as is Kebodeaux. *United States v. Johnson*, 632 F.3d 912, 931-32 (5th Cir.), *cert. denied*, 132 S. Ct. 135 (2011). Although the rule may be valid as applied to a sex offender who moves interstate, the portion of the statute that gives the Attorney General the authority to apply SORNA to pre-act offenders who move intrastate would not be valid if Congress does not have the power under Article I to apply the statute to pre-act sex offenders. Therefore, our analysis focuses on whether Congress had that authority that it attempted to grant to the Attorney General.

[2] *Cf.* 18 U.S.C. § 2250(a)(2)(B) (criminalizing state sex offenders' failure to register or update registration *if they travel in interstate commerce*).

[3] Thus, even with respect to past federal sex offenders such as Kebodeaux, Congress presumably could remedy the constitutional problem merely by adding an element of interstate travel to the crime of failing to register. Because it is not before us, however, we make
(continued...)

No. 08-51185

This finding of unconstitutionality therefore does not affect the registration requirements for (1) any federal sex offender who was in prison or on supervised release when the statute was enacted in 2006 or (2) any federal sex offender convicted since then. Instead, it applies only to those federal sex offenders whom the government deemed capable of being unconditionally released from its jurisdiction before SORNA's passage in 2006.[4] Moreover, even as to those sex offenders, it means only that Congress could treat them exactly as all state sex offenders already are treated under federal law. It also has no impact on state regulation of sex offenders.

---

[3] (...continued)
no ruling on that speculative issue.

[4] In her well-written dissent, Judge Haynes disputes that the federal government unconditionally released Kebodeaux from its jurisdiction upon his release from custody. Citing the Wetterling Act of 1994, as amended by the Lychner Act of 1996, 42 U.S.C. §§ 14071-14073, *repealed by* SORNA Pub. L. No. 109-248, § 129, 120 Stat. 587, 600 (2006), the dissent argues that Kebodeaux has been subject to federal registration ever since his 1999 conviction. But that notion overlooks a fundamental difference between SORNA and its predecessors.

Although SORNA directly imposes a registration requirement on covered sex offenders, *see* § 16913(a), pre-SORNA federal law merely conditioned federal funding on states' maintaining their own sex-offender registries that were compliant with federal guidelines, *see* § 14071(g) (2000) (repealed by SORNA). Only sex offenders residing in non-compliant states were subject to federal registration for intrastate changes in residence. *See* § 14072-(g)(1)-(3), (i) (2000) (repealed by SORNA).

Because his state of residence, Texas, was compliant with federal guidelines at the time of his offense, Kebodeaux was not subject to federal registration requirements. *See Creekmore v. Attorney Gen. of Tex.*, 341 F. Supp. 2d 648, 654 (E.D. Tex. 2004) (observing that Texas enacted its registry in 1991 and amended it "four times: in 1993, 1995, 1997, and 1999 to ensure that the program met minimum federal requirements" (citations omitted)); *Creekmore v. Attorney Gen. of Tex.*, 116 F. Supp. 2d 767, 773 (E.D. Tex. 2000) (noting that Texas's registration program was "federally-approved"); Wayne A. Logan, *Sex Offender Registration and Community Notification: Past, Present, and Future*, 34 NEW ENG. J. ON CRIM. & CIV. CONFINEMENT 3, 6 (2008) (observing that all fifty states and the District of Columbia had complied with the Wetterling Act by the end of 1996). Thus, before the passage of SORNA, Kebodeaux was subject only to state, not federal, registration obligations.

No. 08-51185

II.

SORNA says, in relevant part, that "[a] sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student."[5] Those requirements are made applicable to former federal sex offenders via 42 U.S.C. § 16913(d) and 28 C.F.R. § 72.3.[6]  SORNA then includes the following criminal provision:

> Whoever—
>     (1) is required to register under [SORNA];
>     (2)    (A) is a sex offender as defined for the purposes of [SORNA] by reason of a conviction under Federal law . . .; or
>         (B) travels in interstate or foreign commerce . . . ; and
>     (3) knowingly fails to register or update a registration as required by [SORNA];
> shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 2250(a).  Kebodeaux argues that Congress has no authority under Article I to subject him to conviction pursuant to § 2250(a)(2)(A). The government, on the other hand, maintains that its power to criminalize the conduct for which Kebodeaux was originally convicted includes the authority to regulate his movement even after his sentence has expired and he has been unconditionally released.

---

[5] 42 U.S.C. § 16913(a).  In addition, "[f]or initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence."  *Id.*  A registration must be updated within three days of any change.  § 16913(c).

[6] *See* § 16913(d) ("The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter . . . and to prescribe rules for the registration of any such sex offenders . . . ."); 28 C.F.R. § 72.3 (specifying that § 16913's requirements apply to all sex offenders, "including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act").

No. 08-51185

The most analogous Supreme Court decision is *United States v. Comstock*, 130 S. Ct. 1949, 1954 (2010), in which the Court examined whether Congress has the Article I power to enact a civil-commitment statute that authorizes the Department of Justice to detain mentally ill, sexually dangerous federal prisoners beyond when they would otherwise be released. The Court upheld that statute on narrow grounds because of "five considerations, taken together." *Id.* at 1956, 1965.

Kebodeaux's facts go beyond those in *Comstock*, however, because this case is not merely about whether Congress can regulate the activity of someone still in federal custody past the expiry of his sentence. Importantly, it raises the further question whether Congress can regulate his activity *solely* because he was once convicted of a federal crime. The "considerations" that the Court found important in *Comstock* are not expansive enough to subject Kebodeaux to federal criminal sanctions under the unusual circumstances that he presents.

## A.

First, the *Comstock* Court explained, and the panel majority here stressed, that Congress has broad authority to enact legislation under the Necessary and Proper Clause. *Id.* at 1956. Thus, to be constitutional under that clause, a statute must constitute a means that is "rationally related"[7] or "reasonably adapted"[8] to an enumerated power. Congress has "a large discretion" as to the choice of means, *id.* at 1957 (quoting *Lottery Case*, 188 U.S. 321, 355 (1903)), and we apply a "presumption of constitutionality" to its enactments, *id.* (quoting

---

[7] *Comstock*, 130 S. Ct. at 1956-57 (citing *Gonzales v. Raich*, 545 U.S. 1, 22 (2005)*; Sabri v. United States*, 541 U.S. 600, 605 (2004); *United States v. Lopez*, 514 U.S. 549, 557 (1995); *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276 (1981)).

[8] *Comstock*, 130 S. Ct. at 1957 (quoting *Raich*, 545 U.S. at 37) (Scalia, J., concurring in the judgment); *United States v. Darby*, 312 U.S. 100, 121 (1941).

No. 08-51185

*United States v. Morrison*, 529 U.S. 598, 607 (2000)). This first factor is not fact-specific; it suggests that the analysis always starts with a heavy thumb on the scale in favor of upholding government action.[9]

We must take care not to misunderstand the use of the words "rationally related" as implying that the Necessary and Proper Clause test is akin to rational-basis scrutiny under the Due Process and Equal Protection Clauses.[10] That would mean that federal action would be upheld so long as there is merely a conceivable rational relationship between an enumerated power and the action in question.[11] But that would be inconsistent with both the Court's Commerce Clause jurisprudence[12] and *Comstock*, which held that 18 U.S.C. § 4248 is

---

[9] Although the panel majority was correct that there is a presumption of constitutionality, it is troubling that it engaged in an extended discussion of all the *different* constitutional challenges against which SORNA has been upheld, as though those instances somehow make it more likely that *Kebodeaux's* constitutional challenge fails. That courts have upheld the five-year-old statute against an *ex post facto* challenge, a due process challenge, a non-delegation challenge, and a Commerce Clause challenge to a clause that explicitly is limited to persons traveling in interstate commerce does not suggest that we must uphold *this* SORNA provision against *this* challenge.

[10] *See Comstock*, 130 S. Ct. at 1966 (Kennedy, J., concurring in the judgment) ("This Court has not held that the [*Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487-88 (1955),] test, asking if 'it might be thought that the particular legislative measure was a rational way to correct' an evil, is the proper test in this context. . . . Indeed, the cases the Court cites in the portion of its opinion referring to 'rational basis' are predominantly Commerce Clause cases, and none are due process cases.").

[11] *See id.* (Kennedy, J., concurring in the judgment) (explaining that rational-basis scrutiny under the Due Process Clause requires asking whether "'it might be thought that the particular legislative measure was a rational way to correct' an evil" (quoting *Lee Optical*, 348 U.S. at 487-88)).

[12] *See id.* at 1967 (Kennedy, J., concurring in the judgment) ("[The Court's Commerce Clause] precedents require a tangible link to commerce, not a mere conceivable rational relation, as in *Lee Optical*."). For example, in *Morrison* the Court struck down a civil remedy for violence against women under the Commerce Clause despite copious evidence that such violence had a substantial effect on (and thus was conceivably rationally related to) interstate commerce. *See Morrison*, 529 U.S. at 615 (finding statute unconstitutional because, "[i]f accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, produc-
(continued...)

No. 08-51185

constitutional because of "five considerations, taken together," only one of which involves "the sound reasons for the statute's enactment in light of the Government's [legitimate interest]."[13]  Thus, unless this court were to hold that the other "considerations" in *Comstock* were entirely superfluous, it follows that, although our analysis begins with great deference to constitutionality, we should not confuse it with Due Process Clause rational-basis scrutiny.

## B.

The second factor in *Comstock*, 130 S. Ct. at 1958, is that the civil-commitment statute at issue was but "a modest addition to a set of federal prison-related mental-health statutes that have existed for many decades."  Although "even a longstanding history of related federal action does not demonstrate a statute's constitutionality," *id.* (citing *Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 678 (1970)), it expands the deference afforded to a statute.[14]  Conversely, the absence of an historical analog reduces that deference.[15]

---

[12] (...continued)

tion, transit, or consumption"); *id.* at 628-29 (Souter, J., dissenting) (discussing the "mountain of data assembled by Congress . . . showing the effects of violence against women on interstate commerce").  So, plainly, more is required.

[13] *Comstock*, 130 S. Ct. at 1965.  For example, the *Comstock* Court also relied on the fact that the statute was "narrowly tailored" or "narrow [in] scope," *id.*, an analysis that is not necessary to uphold a law under rational-basis scrutiny under the Due Process or Equal Protection Clause, *see, e.g., Lee Optical*, 348 U.S. at 487-88.

[14] *Cf. Walz*, 397 U.S. at 678 ("'If a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it. . . .'" (quoting *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31 (1922))).

[15] *Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1641 (2011) ("Respondents rightly observe that federal courts have not often encountered lawsuits brought by state agencies against other state officials.  That does give us pause.  Lack of historical precedent can indicate a constitutional infirmity . . ." (citing *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3159 (2010))); *Free Enter. Fund*, 130 S. Ct. at 3159 ("Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack (continued...)

8

No. 08-51185

SORNA's sex-offender-registration requirements have a short history: They have existed only since 2006, and federal law relating to sex-offender registration only since 1994.[16]  The government admits that federal sex-offender registration laws are of "relatively recent vintage" but urges that they should be analogized to probation or supervised-release laws, which have a longer pedigree.

There is, however, a big difference between SORNA's sex-offender-registration requirements and probation or supervised release—a distinction that goes to the heart of this case.  Unlike the situation involving probation or supervised release, SORNA's sex-offender-registration requirements (and § 2250(a)-(2)(A)'s penalties) were not a condition of Kebodeaux's release from prison, let alone a punishment for his crime.[17]

The Department of Justice cannot find a single authority, from more than two hundred years of precedent, for the proposition that it can reassert jurisdiction over someone it had long ago unconditionally released from custody just because he once committed a federal crime.  Thus, SORNA's registration requirements for federal sex offenders are constitutionally novel, as the panel majority conceded.  This factor weighs against the government.

---

[15] (...continued)
of historical precedent for this entity" (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting))).

[16] *See Carr v. United States*, 130 S. Ct. 2229, 2232 (2010); Richard G. Wright, *Sex Offender Post-Incarceration Sanctions: Are There Any Limits?*, 34 NEW ENG. J. ON CRIM. & CIV. CONFINEMENT 17, 29-36 (2008) (discussing history of federal sex-offender-registration laws).

[17] Every circuit, including ours, has held that, unlike probation or supervised release, SORNA's registration requirements are civil regulations whose purpose is not to punish for crimes.  *See United States v. Young*, 585 F.3d 199, 204 (5th Cir. 2009) (per curiam); *cf. Smith v. Doe*, 538 U.S. 84, 101-02 (2003) (upholding Alaska's sex-offender-registration statute against *ex post facto* challenge and distinguishing it from probation and supervised release because it is not a punishment).

No. 08-51185

## C.

This brings us to the third factor. That inquiry is whether Congress reasonably extended its well-established laws by applying sex-offender-registration requirements to someone long free from federal custody or supervision.[18]

### 1.

The government argues, and the panel majority held, that the statute is reasonably adapted to Congress's military powers. For that proposition, they again rely on the analogy between sex-offender-registration requirements, on the one hand, and supervised release and probation, on the other: Because the latter are constitutional, the former must be too, or so the argument goes.

But that theory obscures two crucial distinctions: First, as we have mentioned, SORNA's registration requirements, unlike probation and supervised release, are not a means to punish a sex offender for committing his crime[19] but instead are merely civil regulations.[20] Indeed, they cannot serve any punitive purpose in the case of Kebodeaux, because SORNA was enacted long after he committed his crime. If SORNA's registration requirements were—like probation and supervised release—criminal punishments, they would violate the

---

[18] *See Comstock*, 130 S. Ct. at 1961 (explaining that the third factor is that "Congress reasonably extended its longstanding civil-commitment system to cover mentally ill and sexually dangerous persons who are already in federal custody, even if doing so detains them beyond the termination of their criminal sentence").

[19] *See id.* at 1979 n.12 (Thomas, J., dissenting) (referring to supervised release as a "form of punishment"); *United States v. Knights*, 534 U.S. 112, 119 (2001) ("Probation, like incarceration, is a 'form of criminal sanction . . . .'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987))).

[20] *See Young*, 585 F.3d at 204; *see also Smith*, 538 U.S. at 101 (explaining why Alaska's sex-offender-registration requirements are not, like probation and supervised release, forms of punishment).

No. 08-51185

*Ex Post Facto* Clause.[21]  But because SORNA's registration requirements are civil and were enacted after Kebodeaux committed his crime, the government cannot justify their constitutionality on the ground that they merely punish Kebodeaux for the crime he committed while in the military.[22]

Secondly, unlike SORNA's registration requirements, probation and supervised release are conditions of release from (or instead of) custody.[23]  Like the civil confinement statute at issue in *Comstock*, they are thus "reasonably adapted . . . to Congress' power to act as a responsible federal custodian" of its prisoners, because they "avert the public danger likely to ensue from the release of . . . detainees."  *Comstock*, 130 S. Ct. at 1961 (internal quotation marks and citations omitted).  By contrast, although § 2250(a) is surely meant to "avert . . . public danger," it is not, at least in cases such as Kebodeaux's, from "the *release*

---

[21] *Young*, 585 F.3d at 204; *see also United States v. Caulfield*, 634 F.3d 281, 283 (5th Cir. 2011) ("The heart of the *Ex Post Facto* Clause bars application of a law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." (quoting *Johnson v. United States*, 529 U.S. 694, 699 (2000))).

[22] The panel majority inaccurately asserted that Kebodeaux conflates his Article I argument with an Ex-Post-Facto-Clause argument.  In fact, his Article I contention works only *because* § 2250(a)(2)(A) is not an *ex post facto* criminal punishment.  Because SORNA's registration requirements are *not* criminal punishments, but a civil regulatory scheme, they do not pose an *ex post facto* problem.  But for that very reason—that SORNA registration is a civil regulatory scheme and not a punishment imposed on Kebodeaux for his federal crime—Congress needs some other jurisdictional hook to apply the requirement to persons such as him.

[23] *Compare* 18 U.S.C. § 2250(a)(2)(A) (criminalizing the failure to register or update registration as a sex offender regardless of the date of the crime) *and* 28 C.F.R. § 72.3 (specifying that "[t]he requirements of [SORNA] apply to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act") *with* 18 U.S.C. § 3603(1) (tying the duties of the probation officer to "the conditions specified by the sentencing court"), § 3601 (same), § 3563(a) (explaining the "condition[s] of a sentence of probation"), § 3583(d) (same for supervised release), *and United States v. Johnson*, 529 U.S. 53, 56 (2000) ("A prisoner whose sentence includes a term of supervised release after imprisonment shall be released by the Bureau of Prisons to the supervision of a probation officer who shall, during the term imposed, supervise the person released to the degree warranted by the conditions specified by the sentencing court." (quoting 18 U.S.C. § 3624(e)).

No. 08-51185

of . . . detainees,"[24] because it applies even to those who have long severed all ties with the criminal justice system. It therefore makes no sense to say that SORNA's registration requirements are—like probation, supervised release, or the civil commitment of mentally ill prisoners—"reasonably adapted" to the government's role as "custodian . . . of its *prison system*."[25]

The tenuousness of the government's position can be shown just by listing the chain of causation from Congress's military power to its criminalization of Kebodeaux's failure to register a change of address: Congress can supervise military personnel, so it can establish crimes for them, so it can prosecute and convict them, so it can supervise them for the duration of their sentence and while they are in federal custody, *so it can pass a law to protect society from someone who was once in prison but seven years ago had fully served his sentence and has not since been in contact with the federal government.* That last power is not reasonably adapted to Congress's ability to regulate the *military.*

2.

The government, like the panel majority, responds by seizing on language in *Comstock* that says that the power to imprison violators of federal law includes "the additional power to regulate the prisoners' behavior *even after their release.*" *Id.* at 1964 (emphasis added). But the government and the majority quote the Court too selectively by omitting the beginning of the sentence. What *Comstock* actually says is, "Indeed even the dissent acknowledges that Congress has . . . the additional power to regulate the prisoners' behavior even after their release." *Id.* The Court was merely enumerating those government actions that

---

[24] *Comstock*, 130 S. Ct at 1961 (citation omitted) (emphasis added).

[25] *Id.* at 1965 (emphasis added) (holding that "§ 4248 is a reasonably adapted and narrowly tailored means of pursuing the Government's legitimate interest as a federal custodian in the responsible administration of its prison system").

even the *Comstock* dissent conceded were constitutional.[26]  And the portions of the dissent cited by the majority assert only that Congress has the power to regulate a prisoner's behavior post-release as part of his *sentence*; the dissent specifically rejects the notion that the government has open-ended authority to regulate him after his punishment has ended merely by virtue of some sort of vague "special relationship" between the federal government and one who once committed a federal crime.[27]

The *Comstock* majority distanced itself from the notion that the panel majority endorsed here.  The Court cabined its holding by noting that the Solicitor General had conceded that the government could not commit a person who had already been released from federal custody or sent to state custody;[28] only

---

[26] *See id.* at 1964 ("Indeed even the dissent acknowledges that Congress has the implied power to criminalize any conduct that might interfere with the exercise of an enumerated power, and also the additional power to imprison people who violate those (inferentially authorized) laws, and the additional power to provide for the safe and reasonable management of those prisons, and the additional power to regulate the prisoners' behavior even after their release" (citing *id.* at 1976-77, 1978 n.11 (Thomas, J., dissenting)).  The majority opinion cites slip op. p. 17, n.11 of the dissent, but it must have meant note 12, because note 11 does not appear on page 17 (although note 12 does), and note 11 has nothing to do with regulation after release (e.g. in the form of supervised release), whereas that is precisely what is discussed in note 12.

[27] *See id.* at 1979 n.12 (Thomas, J., dissenting) ("Contrary to the Government's suggestion, federal authority to exercise control over individuals serving terms of 'supervised release' *does not derive from the Government's 'relationship' with the prisoner*, . . . but from the original criminal sentence itself." (citations omitted) (emphasis added)); *id.* at 1976-77 (Thomas, J., dissenting) (concluding that "[f]ederal laws that criminalize conduct that interferes with enumerated powers, establish prisons for those who engage in that conduct, and set rules for the care and treatment of prisoners awaiting trial or *serving a criminal sentence*" are constitutional (emphasis added)); *id.* at 1979 (Thomas, J., dissenting) ("Once the Federal Government's criminal jurisdiction over a prisoner ends, so does any 'special relationship' between the government and the former prisoner." (alteration omitted)).

[28] *See id.* at 1963 ("[T]he Solicitor General acknowledges that 'the Federal Government would have no appropriate role' with respect to an individual covered by the statute once 'the transfer to State responsibility and State control has occurred.'" (citation omitted)); *id.* at 1965 (noting that the Solicitor General conceded that "the Federal Government would not have . . . the power to commit a person who . . . has been released from prison and whose period of
(continued...)

No. 08-51185

if he was *still in* federal custody could the government commit him.[29] But if the power to regulate a person stems merely from the fact that he was once convicted of a federal crime, then whether he is presently in federal prison or subject to federal supervision would make no difference: Once he has been convicted of a federal crime, the government's authority over him to protect society would continue as long as he lives.

Thus, in the instant case the government is reneging on precisely those concessions that caused the Court to reason that the civil commitment statute at issue in *Comstock* was "narrowly tailored . . . [to] pursuing the Government's legitimate interest as a federal custodian in the responsible administration of its prison system." *Id.* at 1965. And the panel majority endorsed the government's about-face.

3.

The other case on which the panel majority relied is *Carr*, which it cited for the startling proposition that § 2250(a)(2)(A) is constitutional because the federal government has a "direct supervisory interest" over anyone who once committed a federal sex offense. It is true that *Carr* stated, 130 S. Ct. at 2239, that "the Federal Government has a direct supervisory interest" over federal sex offenders. But, as the panel majority acknowledged, *Carr* did not address the extent of Congress's Article I power at all—it involved a statutory-interpretation issue and an Ex-Post-Facto-Clause question that the Court avoided.[30] Moreover,

---

[28] (...continued)
supervised release is also completed").

[29] *See id.* at 1964-65 (quoting the Solicitor General for the proposition that "[federal authority for § 4248] has always depended on the fact of Federal custody, on the fact that this person has entered the criminal justice system . . .").

[30] *See Carr*, 130 S. Ct. at 2232-33 ("At issue in this case is whether § 2250 applies to sex (continued...)

the briefs in that case show that no one—neither parties nor *amici curiae*—raised the argument that Kebodeaux brings here.[31] Thus, the panel took an isolated statement from *Carr* out of context to make it a constitutional principle with far-reaching implications about the scope of federal power.

The panel majority was correct that § 2250(a)(2)(A) applies to individuals over whom the federal government has a "direct supervisory interest" because they are in custody or have been released from custody on the condition that they comply with SORNA.[32] But that section *also* applies, as relevant here, to those who have long been free of federal custody and supervision after fully serving their sentences. To say that Congress continues to have a "direct supervisory interest" over such persons—like Kebodeaux—is to announce that it has an eternal supervisory interest over anyone who ever committed a federal sex crime. And *that* is no different from saying that Congress has such an interest over anyone who ever committed *any* federal crime, because there is nothing that is constitutionally special about sex crimes.[33]

---

[30] (...continued)
offenders whose interstate travel occurred prior to SORNA's effective date and, if so, whether the statute runs afoul of the Constitution's prohibition on *ex post facto* laws.").

[31] A Commerce Clause argument related to applying the statute to pre-SORNA travel (i.e., not the issue Kebodeaux raises) was made by *amicus* but not addressed by the Court in light of its holding. *See id.* at 2248 (Alito, J., joined by Thomas, J., and Ginsburg, J., dissenting) (noting that "[i]t can also be argued that a broader construction would mean that Congress exceeded its authority under the Commerce Clause," but not addressing that argument (citing Brief for the National Association of Criminal Defense Lawyers as *Amicus Curiae* 16-17)).

[32] *See* 18 U.S.C. § 3583(d) (making compliance with SORNA "an explicit condition" of a sex offender's supervised release).

[33] Similarly, the law concerning Congress's military powers suggests that Congress does not have continuing military jurisdiction over Kebodeaux after he was discharged from the military. Except in very limited situations, a discharged person is no longer subject to the Uniform Code of Military Justice. *See* 10 U.S.C. § 803. In *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 13, 22-23 (1955), the Court held that the Necessary and Proper Clause does
(continued...)

No. 08-51185

4.

In sum, as applied to Kebodeaux, SORNA's registration requirements are not, and cannot be, an attempt to punish the initial crime or to act as a responsible custodian of prisoners; they are merely an effort to protect the public from those who may be dangerous because they once were convicted of a sex offense. By that logic, Congress would have never-ending jurisdiction to regulate anyone who was ever convicted of a federal crime of any sort, no matter how long ago he served his sentence, because he may pose a risk of re-offending.

Indeed, that logic could easily be extended beyond federal crimes: Congress could regulate a person who once engaged in interstate commerce (and was thereby subject to federal jurisdiction) on the ground that he now poses a risk of engaging in interstate commerce again. In short, the only "rational relation" between § 2250(a)(2)(A)'s application to Kebodeaux and an enumerated federal power is that Kebodeaux was *once* subject to federal jurisdiction—reasoning that is so expansive that it would put an end to meaningful limits on federal power. The third *Comstock* "consideration" thus favors Kebodeaux.

D.

The fourth "consideration" is whether "the statute properly accounts for

---

[33] (...continued)
not give the federal government power to try an ex-military serviceman by court-martial five months after he left the military for a crime committed while in the military. Because he had left the military, he had the same Article III protections as did any ordinary civilian.

If anything, the link between the military power and the federal government's action is even more attenuated in this case than in *Toth*, because the court-martial in *Toth* served the purpose of punishing someone for his illegal conduct *while in the military*, *see id.* at 13, whereas here the sex-offender-registration requirements serve no such purpose. As discussed, SORNA's purpose is merely to reduce the risk to society posed by one who has committed certain crimes. *See* 42 U.S.C. § 16901 (stating that SORNA's purpose is to "protect the public from sex offenders and offenders against children"). Indeed, the government does not argue that it still has military jurisdiction over Kebodeaux, but only that its power to criminalize his predicate crime includes the power to regulate his present-day conduct.

state interests." *Comstock*, 130 S. Ct. at 1962. "[T]he 'States possess primary authority for defining and enforcing the criminal law.'" *Lopez*, 514 U.S. at 561 n.3 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993)). Thus, "[w]hen Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction.'" *Id.* (quoting *United States v. Enmons*, 410 U.S. 396, 411-12 (1973)). Alternatively, it "displace[s] state policy choices . . . [when] its prohibitions apply even in States that have chosen not to outlaw the conduct in question." *Id.* (citation omitted).

As the government points out, some aspects of SORNA do accommodate state interests. A state forgoes only ten percent of its federal funding by failing substantially to comply with SORNA (for example, by failing to maintain a registry). *See* 42 U.S.C. § 16925(a). And § 2250 itself allows an affirmative defense if "uncontrollable circumstances"—which, according to the government, would include a state's failure to collect registration data—prevent an individual from complying with its registration requirements. 18 U.S.C. § 2250(b). Indeed, as the panel pointed out, this court recently upheld SORNA against a Tenth-Amendment challenge on the ground that the statute does not require the states to comply with it. *United States v. Johnson*, 632 F.3d 912, 920 (5th Cir.), *cert. denied*, 132 S. Ct. 135 (2011).

Nevertheless, the degree of state accommodation with respect to § 2250-(a)(2)(A) is substantially less than that present in *Comstock*, 130 S. Ct. at 1962-63, in which the Court found that Congress's statutory scheme for civilly confining mentally ill and sexually dangerous prisoners accommodated state interests because the Attorney General was required to notify interested states about the confinement and to *release prisoners* if a state wished to assert authority over them. Thus, continued federal confinement was, in essence, continually subject to the states' veto.

No. 08-51185

Here, by contrast, there is no provision by which someone federally prosecuted under SORNA can be subjected to state penalties or transferred to state custody instead. Unless a former federal sex offender proves that a state has made it impossible for him to register,[34] he is subject to federal prosecution and up to ten years of imprisonment for failing to update his state registration within three days of a change of address, employment, name, or student status, even if the state believes a more moderate response would be appropriate[35] (which Texas and many other states apparently do[36]). The state is thus forced into the binary choice of keeping a former federal sex offender off its own registry entirely or subjecting him to § 2250(a)(2)(A)'s harsh penalties; it cannot control the punishment given to those who fail to update their registration.

Thus, because SORNA mandates federal penalties for the failure of a *state* resident to update his *state* sex offender registration solely because of an *intrastate* change of address without giving states a veto of the sort present in *Comstock*, it is a much more substantial imposition on the states' traditional police-power authority over the criminal law within their own borders than what was

---

[34] *See* 18 U.S.C. § 2250(b); Resp. to Pet. for Reh'g En Banc at 12.

[35] *See* 42 U.S.C. § 16913(a)-(c) (requiring a sex offender to register in each jurisdiction in which he resides and to update that registration); 18 U.S.C. § 2250(a) (criminalizing the failure to update registration upon any change of address if one has been convicted of a federal sex offense); U.S. DEP'T OF JUSTICE, THE NATIONAL GUIDELINES FOR SEX OFFENDER REGISTRATION AND NOTIFICATION 6 (2008), *available at* http://www.ojp.usdoj.gov/smart/pdfs/-final_sornaguidelines.pdf ("[SORNA] generally constitutes a set of *minimum* national standards and sets a floor, not a ceiling, for jurisdictions' programs.").

[36] Texas and forty-six other states do not substantially comply with SORNA. TEX. SENATE CRIMINAL JUSTICE COMM., INTERIM REPORT TO THE 82ND LEGISLATURE 14 (2011), *available at* http://www.senate.state.tx.us/75r/senate/commit/c590/c590.InterimReport81.pdf. One of the problems with SORNA is that it "relies solely on [the] offense" of conviction to determine whether a former sex offender is a threat to public safety, not "risk assessments" of a sex offender's likelihood to reoffend. *Id.*; *see also id.* at 19 (recommending risk assessments). In addition, it does so without any apparent increase in effectiveness, because "[t]he recidivism rate of those on the registry is not lower than that of the individuals not on the registry." *Id.* at 16.

No. 08-51185

at issue in *Comstock*.  It is true that § 2250(a)(2)(A) applies only to federal sex offenders; but, as we have discussed, in the case of persons such as Kebodeaux those are individuals with whom the federal government had previously severed all ties.  Accordingly, the fourth *Comstock* "consideration" ultimately cuts in Kebodeaux's favor.

### E.

The final factor is whether the "links between [the statute] and an enumerated Article I power are not too attenuated" and the "statutory provision [is not] too sweeping in its scope." *Comstock*, 130 S. Ct. at 1963.  The panel majority's position was that the statute is narrow because it applies only to sex offenders.  But even assuming that a statute that applies to all sex offenders were considered narrow, its *logic* is expansive, because the only jurisdictional basis for § 2250(a)(2)(A) is the fact that a person once committed a federal sex crime. That reasoning opens the door, as discussed in part II.C, to congressional power over anyone who was ever convicted of a federal crime of any sort.  That is anything but narrow.  Accordingly, the fifth *Comstock* factor also cuts in Kebodeaux's favor.

### F.

In summary, even taking into account "the breadth of the Necessary and Proper Clause," *Comstock*, 130 S. Ct. at 1965, SORNA's registration requirements and criminal penalty for failure to register as a sex offender, as applied to those, like Kebodeaux, who had already been unconditionally released from federal custody or supervision at the time Congress sought to regulate them, are not "rationally related" or "reasonably adapted" to Congress's power to criminalize federal sex offenses to begin with. The statute's regulation of an individual, after he has served his sentence and is no longer subject to federal custody or

No. 08-51185

supervision, solely because he once committed a federal crime, (1) is novel and unprecedented despite over 200 years of federal criminal law, (2) is not "reasonably adapted" to the government's custodial interest in its prisoners or its interest in punishing federal criminals, (3) is unprotective of states' sovereign interest over what intrastate conduct to criminalize within their own borders, and (4) is sweeping in the scope of its reasoning. For those reasons, and with high respect for its careful reasoning, the panel majority wrongly decided this case.[37]

## III.

Finally, the government, like the panel concurrence, offers an alternative argument for upholding the statute: that SORNA's registration requirements for federal sex offenders, and the criminal penalties for failing to comply, are necessary and proper to effect Congress's Commerce Clause power. Under its Commerce-Clause and Necessary-and-Proper-Clause authority, Congress may (1) "regulate the use of the channels of interstate commerce," (2) "regulate and protect the instrumentalities of . . . or persons or things in interstate commerce, even though the threat may come only from intrastate activities," and (3) "regulate those activities having a substantial relation to interstate commerce, *i.e.*,

---

[37] The panel majority also urged that it would be unwise to decide in favor of Kebodeaux because that would require disagreeing with *United States v. George*, 625 F.3d 1124, 1130 (9th Cir. 2010), *vacated on other grounds*, 672 F.3d 1126 (9th Cir. 2012). That case, however, is easily distinguishable.

Because the defendant in *George* was convicted in 2008, compliance with SORNA was an explicit condition of his sentence. 18 U.S.C. § 3583(d). He therefore fell into the category of offenders to whom SORNA is perfectly constitutional. But because Kebodeaux was long free from federal custody before SORNA even existed, he is in a different category that *George* had no occasion to consider. To the extent *George* implies that the federal government has Article I power to regulate anyone who ever committed a federal sex crime—and by implication anyone who ever committed any federal crime, because it has a "direct supervisory interest" over them —its reasoning stretches far beyond the issue before that court and is unpersuasive.

those activities that substantially affect interstate commerce."[38]

The panel concurrence maintains that this case fits into the first two categories of Commerce Clause authority. According to that view, SORNA's regulation of federal sex offenders can be seen as necessary and proper regulation of "the channels of" or "persons . . . in interstate commerce" because it reduces the risk of unmonitored interstate travel by sex offenders. The argument in the concurrence runs as follows: Because a federal sex offender would face no federal sanction for failing to register until he travels interstate, he could hide from authorities before he does so. Thus, to prevent the purported *risk* that he evades detection before traveling interstate, no requirement of interstate travel ought to be necessary; Congress should be able to criminalize the mere act of failing to register, even if a sex offender never travels interstate, because it reduces the risk that he will someday travel interstate undetected.

Thus, the concurring judge on the panel would subtly but significantly expand Congress's power under the first two categories of Commerce Clause authority beyond the regulation of "*the use of* the channels of interstate commerce" or "persons or things *in* interstate commerce," *Lopez*, 514 U.S. at 558 (emphasis added), to the regulation of *the possible use* of the channels of interstate commerce and persons or things *because they will potentially* be in interstate commerce. With due respect for the concurrence's well-stated position, its contention is both contrary to precedent and so expansive that it would confer on the federal government plenary power to regulate all criminal activity—precisely what the Court sought to avoid in *Lopez* and *Morrison*.

---

[38] *See Lopez*, 514 U.S. at 558-59, 567 (citation omitted) (holding that because the Gun-Free School Zones Act does not fall within any of the three categories, it is an unconstitutional exercise of federal power).

No. 08-51185

A.

1.

Under the first category of its Commerce Clause authority, Congress may regulate the use of the channels of interstate commerce: "the use of the interstate transportation routes through which persons and goods move." *Morrison*, 529 U.S. at 613 n.5 (internal quotation marks omitted). "Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil . . . ."[39] Because the federal government "exercis[es] [a] police power . . . within the field of interstate commerce," *Brooks*, 267 U.S. at 436-37, *i.e.*, with respect to the channels, instrumentalities, persons, and goods involved in interstate commerce, Congress may regulate those who use the channels of interstate commerce even if their activity is non-economic in nature. Thus, for example, Congress may prohibit "enticing a woman from one state to another for immoral ends, whether for commercial purposes or otherwise," *id.* at 437, transporting kidnaped persons across state lines, *United States v. Darby*, 312 U.S. 100, 113 (1941), traveling across state lines to commit domestic violence, *United States v. Lankford*, 196 F.3d 563, 572 (5th Cir. 1999), or traveling interstate as a state sex offender without having first registered as such.[40]

But just as this category of Commerce-Clause authority gives the federal government a "police power" over those who use the channels of interstate commerce, even if their activity is non-commercial, *Brooks*, 267 U.S. at 437, the cor-

---

[39] *N. Am. Co. v. SEC*, 327 U.S. 686, 705 (1946) (citing *Brooks v. United States*, 267 U.S. 432, 436-37 (1925)); *accord Lopez*, 514 U.S. at 558 ("Congress may regulate the use of the channels of interstate commerce.").

[40] *See United States v. Whaley*, 577 F.3d 254, 258 (5th Cir. 2009) ("Because § 2250[(a)-(2)(B)] applies only to those failing to register or update a registration after traveling in interstate commerce—in this case, Whaley traveled from Kansas to Texas—it falls squarely under the first *Lopez* prong.").

ollary is that that police power must also be limited to the "field of interstate commerce," *see id.* at 436.  For example, although Congress may regulate those who use the channels of interstate commerce for any reason, "[t]he regulation . . . of *intrastate* violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Morrison*, 529 U.S. at 618 (emphasis added).

In *Whaley*, 577 F.3d at 259-60, in which this court upheld SORNA's requirement that state sex offenders register their address—as distinguished from the federal sex-offender-registration requirement at issue here—we were careful to limit our holding by explaining that the statute at issue there neither targets nor sanctions anyone who did not in fact use the channels of interstate commerce.  We explained that, with respect to state sex offenders, SORNA punishes a person only *if he travels interstate* without having first registered or updated his registration.  *Id.* at 261.  Thus, the registration requirement's "focus" with regard to state offenders is solely on enforcing the criminal prohibition on traveling interstate without having registered—"rather than on requiring sex offender registration generally." *Id.* at 259.[41]

## 2.

As the Court explained in *Carr*, 130 S. Ct. at 2238, however, Congress "chose to handle federal and state sex offenders differently."[42]  In contrast to SORNA's regulatory scheme with regard to state sex offenders, Congress, for federal offenders, "requir[es] sex offender registration generally." *Whaley*, 577

---

[41] *See also id.* at 260 ("And perhaps most significantly . . . a [state] sex offender who does not travel in interstate commerce may ignore SORNA's registration requirements without fear of federal criminal consequences.").

[42] *Compare* 18 U.S.C. § 2250(a)(2)(A) *with* § 2250(a)(2)(B).  The structure of § 2250(a) is such that all federal sex offenders are covered under § 2250(a)(2)(A), but all remaining sex offenders, *i.e.*, state sex offenders, are under § 2250(a)(2)(B).

No. 08-51185

F.3d at 259.  The statutes regulating the movement of all federal sex offenders, 42 U.S.C. § 16913 and 18 U.S.C. § 2250(a)(2)(A), apply to all intrastate as well as interstate movement without regard to whether a sex offender ever uses the channels of interstate commerce.  Those statutes therefore do not regulate only activity "directed" at the channels of interstate commerce.  *Morrison*, 529 U.S. at 617.  Federal sex offenders are subject to criminal sanctions if they fail to register or update their registration even if they never step foot outside their state.  In short, federal sex offenders are regulated merely by virtue of the fact that they are federal sex offenders.  The view expressed in the panel concurrence would thus do away with precisely the limits we considered crucial to our holding in *Whaley*.

Indeed, notably, the Solicitor General has expressly denied that § 2250-(a)(2)(A) is constitutional as a regulation of the channels of interstate commerce, asserting instead that it applies because the federal government has a "direct supervisory interest" over those who committed federal offenses, *see Carr*, 130 S. Ct. at 2238-39, irrespective of whether they have a connection to interstate commerce.[43]  Here the government makes an about-face only now that its original justification for the statute's constitutionality—that of the panel majority—is in question in light of the fact that the panel opinion has been vacated for rehearing en banc.

---

[43] In *Carr*, the Solicitor General expressly asserted that § 2250(a) "reaches two categories of sex offenders: those whose underlying sex offenses were criminalized by virtue of federal or tribal authority . . ., and all other sex offenders whose actions directly implicated Congress's Commerce Clause authority as a result of 'travel[ing] in interstate or foreign commerce . . . .'" Brief for United States at 21-22, *Carr*, 130 S. Ct. 2229 (No. 08-1301), 2010 WL 181570, at *21-22; *see Carr*, 130 S. Ct. at 2238 ("According to the Government, these categories correspond to two alternate sources of power to achieve Congress's aim of broadly registering sex offenders." (internal quotation marks omitted)).

No. 08-51185

3.

The panel concurrence nevertheless urges that SORNA's registration scheme for federal sex offenders is constitutional as well, because it allows the federal government better to monitor sex offenders in case they someday travel interstate. The concurrence therefore would expand the federal police power over individuals who "use . . . the channels of interstate commerce," *see Lopez*, 554 U.S. at 558; *Brooks*, 267 U.S. at 437, to those who might someday do so.

Neither this court nor the Supreme Court, however, has ever extended Congress's "police power" over those who use the channels of interstate commerce to punish those who are not presently using them but might do so. The theory expressed in the panel concurrence is unprecedented,[44] and for good reason: Because every person is mobile, anyone might someday travel interstate. Thus, by the reasoning of the concurrence, the federal government could regulate anyone on that ground who might someday travel interstate. Myriad, longstanding federal statutes, both economic and non-economic, that have as a jurisdictional nexus the movement of a person across state lines would suddenly no longer need that nexus.[45]

---

[44] The recent Tenth Circuit case that the panel concurrence cited is inapposite; it addresses only whether § 2250(a)(2)(A) is constitutional under the Commerce Clause on the assumption that requiring intrastate sex offender registration is constitutional, an assumption that trivializes the whole question. *See United States v. Yelloweagle*, 643 F.3d 1275, 1289 (10th Cir. 2011) (holding that Congress has the power to criminalize a federal sex offender's intrastate failure to register under § 2250(a)(2)(A) *on the conceded assumption* that it has the power to require a federal sex offender to register purely intrastate activity), *cert. denied*, 132 S. Ct. 1969 (2012). If anything, that the panel majority made sure to consider the issue only on those exceptionally narrow grounds suggests that it attempted to avoid precisely the weightier question that we face here.

[45] *See, e.g.,* 18 U.S.C. § 228(a)(2) (criminalizing interstate travel to evade child support obligations); § 1073 (interstate flight to avoid prosecution, giving testimony, service of process, or contempt proceedings under state or federal law); § 1201(a)(1) (interstate transportation of a kidnaped person); § 1231(interstate transportation of strikebreakers); § 1369 (interstate travel with intent to injure or destroy a public monument); § 2101 (interstate travel with intent to cause riots); § 2261(a)(1) (interstate travel with intent to commit domestic violence);
(continued...)

No. 08-51185

For example, it is a federal crime to travel across state lines to evade child-support obligations. 18 U.S.C. § 228(a)(2). As with former federal sex offenders, deadbeat parents might move around within a state to evade state authorities, and as with former federal sex offenders, that might increase the risk that they go undetected before they travel across state lines. Therefore, by the logic of the panel concurrence, the federal government should be able to regulate the intra-state movement of deadbeat parents as well.

Thus, Congress could require anyone who owes child support obligations under state law to report their changes of address to the federal government, and if they do not, the Attorney General could criminally prosecute them; the government would no longer need to wait until deadbeat parents cross state lines: The crime would be complete when they move intrastate without notifying federal authorities, because of the likelihood that they might otherwise someday cross state lines undetected. The federal government could, as here, use the mere risk of travel across state lines to justify far-reaching intrastate regulation in an area of traditional and exclusive state concern.

Indeed, there is nothing about the panel concurrence's reasoning that limits its application to reporting requirements and criminal punishments for failing to comply with them. For example, it is a federal crime to transport a kidnaped person across state lines. 18 U.S.C. § 1201(a)(1). As with former federal sex offenders, someone who is transporting a kidnaped person is capable of moving around and thereby potentially evading state authorities. And as with former federal sex offenders, were the federal government to have no jurisdiction

---

[45] (...continued)
§ 2421 (interstate transportation of prostitutes); § 2423 (interstate transportation of minors for illicit purposes); *Morrison*, 529 U.S. at 613 n.5 (noting 18 U.S.C. § 2261(a)(1), which criminalizes interstate spousal abuse). Most obviously, 18 U.S.C. § 2250(a)(2)(B), which criminalizes a state sex offender's travel across state lines without having registered, would no longer need interstate travel as a jurisdictional hook; Congress could require registration of all sex offenders generally.

No. 08-51185

over kidnapers until they cross state lines, the likelihood that they would evade authorities before traveling interstate would be greater. Thus, according to the concurrence, the federal government should have the power to criminalize the intrastate transportation of kidnaped persons, just as it should have the power to proscribe the intrastate movement of sex offenders who did not register, because, in both cases, it would reduce the risk that the criminals evade detection before crossing state lines.

More generally still, every crime (indeed every act) brings with it the risk that the perpetrator will flee across state lines before being detected. Although the panel concurrence is stated in the context of former sex offenders, there is nothing limiting its logic to past, rather than present, criminals. Accepting his logic—that the mere risk that a dangerous person will cross state lines undetected gives the federal government authority to police his intrastate movements preemptively—would mean that the federal government would have the power to arrest someone who committed a murder, rape, or any other crime traditionally subject to state authority on the ground that he might otherwise evade state authorities and escape across state lines undetected after doing so. In short, the concurrence offers no limiting principle that would allow the federal government to track and arrest former sex offenders because they might someday travel interstate, but not allow it to do the same to anyone else for that same reason.

4.

The basic flaw in the panel concurrence is that it overlooks the role of the states in policing within their own borders, relying on the implicit premise that the federal government must regulate sex offenders' intrastate movements because the states will not do so. Every state has its own sex offender registry and has every incentive to track and arrest sex offenders as long as they remain intrastate. For example, it was state, not federal, authorities—specifically,

No. 08-51185

El Paso Police Department officers—who both registered Kebodeaux and discovered that he had failed to update his registration. Indeed, the federal sex-offender registry consists of nothing more than the amalgamation of state registry (along with tribal and territorial registry) data obtained from local officials.[46]

Only if a sex offender travels out-of-state—i.e., uses the channels of interstate commerce—does a state's jurisdiction end, making it inadequate to the task of tracking and arresting a sex offender—and the federal government's role there begins. To give, instead, to the federal government the overlapping power to do exactly what a state could already do itself, in an area completely unrelated to commerce, just because criminals, like all human beings, can potentially cross state lines, would violate basic tenets of federalism.[47] In effect, the panel concurrence asserts that the federal government should be able to police individuals within state borders just because states might not do so and those individuals might thus pose a risk to inhabitants of other states. But the federal government's jurisdiction does not expand or contract based on a state's criminal-policy choices.[48]

---

[46] *See* 42 U.S.C. §§ 16920-16921 (stating that the National Sex Offender Registry's web site shall include "relevant information . . . listed on a jurisdiction's Internet site" and that the Attorney General shall include information in the Registry obtained from "an appropriate official in the jurisdiction" of registration); *Sex Offender Registry Websites*, FBI.GOV, http://www.fbi.gov/scams-safety/registry (last visited June 6, 2012) (linking to every state sex offender registry and explaining that "the national registry simply enables a search across multiple jurisdictions").

[47] *See Morrison*, 529 U.S. at 611 ("Were the Federal Government to take over the regulation of entire areas of traditional state concern, areas having nothing to do with the regulation of commercial activities, the boundaries between the spheres of federal and state authority would blur" (quoting *Lopez*, 514 U.S. at 577 (Kennedy, J., concurring)), "and political responsibility would become illusory," *Lopez*, 514 U.S. at 577 (Kennedy, J., concurring)).

[48] *See Darby*, 312 U.S. at 114 ("Th[e power of Congress over interstate commerce] can neither be enlarged nor diminished by the exercise or non-exercise of state power.").

### B.

The panel concurrence fares no better under the second category of Congress's Commerce-Clause authority:  Congress may regulate the instrumentalities of, and, as most relevant here, persons or things in, interstate commerce, as well as intrastate activities threatening them.  *Lopez*, 514 U.S. at 558.  For example, the Court has upheld the regulation of vehicles used in interstate commerce,[49] the destruction of aircraft,[50] and thefts from interstate shipments[51] on those grounds.

The panel concurrence took this category of authority to mean that Congress may police any person or thing that might cross state lines.  That misunderstands the precedent.  First, crossing state lines does not mean a person is engaging "in interstate commerce," because that mere fact does not constitute engaging in "commerce" by any definition of the term.  Rather, it constitutes a "use of the channels of interstate commerce," which the first category of Commerce-Clause authority is meant to regulate.  *See* part III.A.  With all due respect, the concurrence thus confuses the first category of regulable activity with the second.

Second, a person who only *might* cross state lines is not engaging "in interstate commerce," because he has not yet engaged in interstate activity.  Thus, SORNA's sex-offender-registration requirements do not regulate persons *in* interstate commerce, because sex offenders do not engage in activity that is either "interstate" or "commerce" just by virtue of being sex offenders.  That a person might someday engage in interstate commerce is very different from saying that he is a "person[] . . . in interstate commerce."  *Lopez*, 514 U.S. at 558.

---

[49] *Lopez*, 514 U.S. at 558 (citing *S. Ry. Co. v. United States*, 222 U.S. 20 (1911)).

[50] *Id.* (citing *Perez v. United States*, 402 U.S. 146, 150 (1971)).

[51] *Id.* (citing *Perez*, 402 U.S. at 150).

No. 08-51185

Under this category of authority, Congress may regulate and protect the latter, not the former. *See id.*

Lastly, though Congress may protect the instrumentalities of, and persons or things in, interstate commerce from intrastate threats, those threats must be "directed at" the instrumentalities of, or persons or things in, interstate commerce; they cannot just be a general threat to society of the sort that sex offenders pose.[52] For example, Congress may regulate the destruction of an "aircraft used, operated, or employed in interstate, overseas, or foreign air commerce," 18 U.S.C. § 32(a)(1), even though the destructive activity occurs within a single state, because aircraft are themselves "instrumentalities of interstate commerce," *Perez*, 402 U.S. at 150. Analogously, Congress may regulate thefts from interstate shipments, even though the thefts occur within a single state, because the shipments themselves are "things in [interstate] commerce." *Id.* (citing 18 U.S.C. § 659). Those regulations are permissible because Congress limited itself to regulating threats "directed at" interstate commerce. *See Morrison*, 529 U.S. at 618.

In short, none of the Court's cases under the second Commerce Clause category even hints, let alone turns on the fact, that Congress could regulate someone because he *might someday* threaten interstate commerce. And for good reason: By that flawed logic, Congress could regulate ordinary thieves on the ground that they pose a "threat" to interstate commerce by virtue of the fact that, someday, they might steal an instrumentality of interstate commerce. Accordingly, the panel concurrence's reliance on the second Commerce Clause category is unpersuasive.

---

[52] *See Morrison*, 529 U.S. at 618 ("The regulation . . . of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." (citing *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 426, 428 (1821) (Marshall, C.J.))).

No. 08-51185

## C.

Indeed, it is telling that the panel concurrence's main source of authority is *Gonzales v. Raich*, 545 U.S. 1 (2005), which held that a congressional statute prohibiting marihuana possession was constitutional under the third category of Commerce-Clause authority, Congress's "power to regulate activities that substantially affect interstate commerce," *id.* at 17. Indeed, the Court stated that "[o]nly the third category" of Congress's Commerce-Clause authority was "implicated in the case at hand." *Id.* It logically follows that the Court believed that the case did not "implicate" the two other "categories" of Commerce-Clause power—those at issue here: Congress's powers to "regulate the channels of interstate commerce" and to "regulate and protect . . . persons or things in interstate commerce." *See id.* at 16-17. That is unsurprising, given that the statute at issue criminalized purely intrastate marihuana possession, which is not a part of "the channels of" or a "thing[] in interstate commerce" or a "threat" to "things in interstate commerce."

Moreover, in holding that the marihuana-possession statute was constitutional under the third Commerce-Clause category, the *Raich* Court explicitly based its decision on the fact that the statute was part of a comprehensive regulation of "quintessentially economic" activity.[53] That the statute regulated economic activity was what distinguished the case from *Lopez* and *Morrison*, which struck down statutes regulating intrastate conduct because of the "noneconomic, criminal nature of the conduct at issue."[54] *Raich* thus merely followed the line

---

[53] *See Raich*, 545 U.S. at 25 ("Unlike those at issue in *Lopez* and *Morrison*, the activities regulated by the CSA are quintessentially economic."); *id.* at 25-26 (defining "economic" activity as "the production, distribution, and consumption of commodities").

[54] *See Morrison*, 529 U.S. at 610-11 ("[A] fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case. . . . *Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based on the activity's substantial effects

(continued...)

drawn in *Lopez* and *Morrison* between economic and non-economic activity under the third category.

In contrast to the statute in *Raich*, and like the statutes in *Lopez* and *Morrison*, the statute here regulates non-economic, intrastate conduct that is not "an essential part of a larger regulation of economic activity." *Lopez*, 514 U.S. at 561. It is a criminal statute that "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Morrison*, 529 U.S. at 610 (quoting *Lopez*, 514 U.S. at 561). It would thus fail the *Lopez/Morrison/Raich* test under the third Commerce Clause category, as it should. To hold a non-commercial statute regulating purely intrastate conduct constitutional would read the word "commerce" out of the Commerce Clause.[55]

But by the logic urged in the panel concurrence, *Raich* should not have turned on the economic/non-economic distinction or on the third category of Commerce Clause authority at all. Because marihuana possessed intrastate surely *poses a risk* of subsequently moving interstate, the Court instead should have found the statute constitutional as a regulation of "the channels of" or "things in interstate commerce" without any need to resort to the catchall category of intrastate "activities that substantially affect interstate commerce." But that was not what the Court did or said in *Raich*.

The panel concurrence's reliance on the first two "categories" of Congress's Commerce-Clause authority instead of the third amounts to an avoidance of *Lopez*, *Morrison*, and *Raich*. That reasoning, far from faithfully applying *Raich*,

---

[54] (...continued)
on interstate commerce, the activity in question has been some sort of economic endeavor." (citations omitted)).

[55] *See id.* at 613 ("[T]hus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.").

No. 08-51185

expands the first two "categories" to cover non-economic, intrastate activities that could not be regulated under the third. The fatal flaw with that argument is that it fails to come to terms with the role of the economic/non-economic distinction in the Court's Commerce-Clause jurisprudence: To be constitutional, regulations of intrastate activity affecting interstate commerce must, logically, have something to do with *commerce*. The statute at issue here does not.

### D.

Finally, the panel concurrence contends that § 2250(a)(2)(A), although a regulation of *intra*state activity, is constitutional as a necessary and proper means of enforcing § 2250(a)(2)(B)'s regulation of *inter*state travel under *Raich*.[56] But it is questionable how subsection (A), which criminalizes *federal* sex offenders' failure to update registration, helps effect subsection (B), which criminalizes *state* sex offenders' failure to update. Subsection (B) makes it a crime for a state sex offender to fail to update his registration *if* he travels in interstate commerce without having registered. Subsection (A) mirrors subsection (B) for federal sex offenders, except that there is no interstate-travel requirement. Not having an interstate travel requirement for *federal* sex offenders in no way helps to protect society from the interstate travel of *state* sex offenders.

### E.

Therefore, as we have explained, the approach reflected in the panel concurrence fails, because it is an attempt to place under the Commerce Clause a

---

[56] *See Raich*, 545 U.S. at 22 (holding that Congress has the authority to enact "comprehensive legislation to regulate the interstate market" even where that "regulation ensnares some purely intrastate activity"); *see Whaley*, 577 F.3d at 259 (upholding 42 U.S.C. § 16913 —which requires sex offenders to register changes of address—even though it applies to intrastate activity, because, without it, "§ 2250 [which criminalizes the failure to register] has no substance").

No. 08-51185

regulation that is neither "interstate" nor "commercial." SORNA's regulation of federal sex offenders does not fit into any of the three categories of regulations that the Supreme Court has upheld under the Commerce Clause, so it cannot be justified under the commerce power.

Upholding § 2250(a)(2)(A) would go a big step further than has the applicable caselaw, because, unlike § 2250(a)(2)(B), this statute regulates federal sex offenders "generally," *Whaley*, 577 F.3d at 259, regardless of whether they engage in interstate activity.[57] The activity criminalized by § 2250(a)(2)(A) is thus not "directed" at interstate commerce in the way that *all* previously upheld provisions regulating the use of the channels of interstate commerce have been.[58]

## IV.

In summary, and for the reasons discussed in parts II and III, 42 U.S.C. § 16913's registration requirements and § 2250(a)(2)(A)'s criminal penalties for failing to register after intrastate relocation are unconstitutional solely as they apply to former federal sex offenders who had been unconditionally released from federal custody before SORNA's passage in 2006. Every federal sex offender subject to federal custody or supervision when SORNA was enacted, or who was convicted since then, is unaffected. Moreover, those who had been unconditionally released before SORNA's passage need not go unmonitored; they could still be regulated just as state sex offenders currently are under federal

---

[57] *Cf. Carr*, 130 S. Ct. at 2248 (Alito, J., joined by Thomas and Ginsburg, JJ., dissenting) (noting that it "can also be argued" that interpreting § 2250(a)(2)(B)—the state sex offender provision—to apply to interstate travel that occurred before SORNA's enactment "would mean that Congress exceeded its authority under the Commerce Clause."). That is *a fortiori* the case here, with the government arguing that an analogous statute requiring no interstate travel at all is constitutional.

[58] *See Morrison*, 529 U.S. at 618 ("The regulation . . . of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." (citing *Cohens*, 19 U.S. (6 Wheat.) at 428) (Marshall, C.J.)).

No. 08-51185

law, and they remain subject to state authority.

The statute is an unlawful expansion of federal power at the expense of the traditional and well-recognized police power of the state.[59]   The conviction is REVERSED, and a judgment of dismissal is RENDERED.

---

[59] The unconstitutionality applies only as to those in the narrow and specific circumstance faced by Kebodeaux, and we make no holding as to others.

No. 08-51185

OWEN, Circuit Judge, concurring.

I join in the judgment reached by a majority of the en banc court. I do not entirely agree, however, with the majority's analysis of Kebodeaux's obligations under federal law to register as a sex offender at the time he completed his sentence for unlawful sexual relations with a fifteen-year-old.

When Kebodeaux was sentenced in court martial proceedings in 1999, he was required by federal law "to register in any State in which [he] resides, is employed, carries on a vocation, or is a student following release from prison or sentencing to probation"[1] if that State required registration. Kebodeaux could have been prosecuted under *federal* law, former 42 U.S.C. § 14072, for knowingly failing to register in any State in which he resides.[2] Federal law did not require States to require federal offenders such as Kebodeaux to register, but it encouraged them to do so.[3] Among other requirements, Texas laws obligated

---

[1] 42 U.S.C. § 14072(i)(4) (Supp. IV 1999), *repealed by* Sex Offender Registration and Notification Act, Pub. L. No. 109-248, 120 Stat. 587 (2006).

[2] *See id.*, which provided:

(i) Penalty

    A person who is–

    (4) sentenced by a court martial for conduct in a category specified by the Secretary of Defense under section 115(a)(8)(C) of title I of Public Law 105-119, and knowingly fails to register in any State in which the person resides, is employed, carries on a vocation, or is a student following release from prison or sentencing to probation, shall, in the case of a first offense under this subsection, be imprisoned for not more than 1 year and, in the case of a second or subsequent offense under this subsection, be imprisoned for not more than 10 years.

[3] *See* 42 U.S.C. § 14071(b)(7) (Supp. IV 1999), *repealed by* Sex Offender Registration and Notification Act, Pub. L. No. 109-248, 120 Stat. 587 (2006):

(7) Registration of out-of-State offenders, Federal offenders, persons sentenced by courts martial, and offenders crossing State borders

(continued...)

36

No. 08-51185

Kebodeaux to register with Texas authorities when he entered the state and to provide notice of a change of residence within the state or the intent to change residence within the state.[4]  Prior to the enactment of SORNA, Kebodeaux could have been convicted under *federal* law, former 42 U.S.C. § 14072(i)(4), if he moved from El Paso, Texas to San Antonio, Texas and failed to notify Texas authorities of this intrastate change in residence in the manner required by state law.  There would have been no constitutional infirmity in this federal law as applied to Kebodeaux because the federal requirement to comply with state registration requirements was in existence at the time that he was sentenced in the court martial proceedings.  Congress was well within its powers under the Necessary and Proper Clause to impose conditions such as intrastate registration and reporting requirements on federal sex offenders in connection with their convictions and sentencing.

SORNA expanded registration requirements for sex offenders.  However, the question before us is whether Congress had the authority to criminalize the conduct for which Kebodeaux was convicted.  Kebodeaux was prosecuted under 18 U.S.C. § 2250(a) for knowingly failing to "update a registration *as required by [SORNA].*"[5]  The registration requirements applicable to Kebodeaux under

---

[3] (...continued)
As provided in guidelines issued by the Attorney General, each State shall include in its registration program residents who were convicted in another State and shall ensure that procedures are in place to accept registration information from–

(A) residents who were convicted in another State, convicted of a Federal offense, or sentenced by a court martial . . . .

[4] *See* TEX. CODE CRIM. PROC. art. 62.051.

[5] 18 U.S.C. § 2250(a) (emphasis added).  That section provides:

§ 2250. Failure to register

(a) In general.--Whoever--

(continued...)

No. 08-51185

SORNA included the obligation to keep his registration current in the jurisdic-tion in which he was residing and that he provide notice of a change of his residence within three business days, but not necessarily to the State in which he was residing.[6]  These requirements differ from Texas law.  One difference is that under Texas law, a sex offender has seven days within which to provide

---

[5] (...continued)

(1) is required to register under the Sex Offender Registration and Notification Act;

(2)(A) is a sex offender as defined for the purposes of the Sex Offender Registration and Notification Act by reason of a conviction under Federal law (including the Uniform Code of Military Justice), the law of the District of Columbia, Indian tribal law, or the law of any territory or possession of the United States; or

(B) travels in interstate or foreign commerce, or enters or leaves, or resides in, Indian country; and

(3) knowingly fails to register or update a registration as required by the Sex Offender Registration and Notification Act;

shall be fined under this title or imprisoned not more than 10 years, or both.

[6] 42 U.S.C. § 16913.  That section provides in pertinent part:

(a) In general

A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student.  For initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence.

. . . .

(c) Keeping the registration current

A sex offender shall, not later than 3 business days after each change of name, residence, employment, or student status, appear in person in at least 1 jurisdiction involved pursuant to subsection (a) of this section and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry.  That jurisdiction shall immediately provide that information to all other jurisdictions in which the offender is required to register.

notice of a change of address.[7] Kebodeaux conceivably could have been convicted under SORNA for conduct that complied with State law and therefore would have also complied with the federal law to which Kebodeaux was subject at the time he was convicted and sentenced.

There is another difference between the federal law in effect when Kebodeaux was sentenced in 1999 and the provisions of SORNA under which he was prosecuted. The federal criminal statute that obtained in 1999, former 42 U.S.C. § 14072(i)(4), provided that the maximum term of imprisonment for a first offense of failing to register in a State was "not more than 1 year," while under SORNA, the maximum term of imprisonment for a first offense is 10 years.[8] Kebodeaux was convicted under SORNA and sentenced to more than one year of imprisonment—one day more.

The question, then, is whether, after Kebodeaux had completed his federal sentence and had been released from federal oversight other than the reporting requirements imposed at the time he was sentenced, Congress could constitutionally subject Kebodeaux to federal reporting requirements that criminalized failure to comply with federal, as opposed to State, reporting requirements regarding intrastate changes of residence, and that increased the punishment for failure to comply with reporting requirements. I agree with a majority of the en banc court that Congress could not constitutionally apply SORNA to Kebodeaux's intrastate relocations under either the Necessary and Proper Clause or the Commerce Clause. I accordingly concur in the judgment.

---

[7] TEX. CODE CRIM. PROC. art. 62.051(a).

[8] 18 U.S.C. § 2250(a).

No. 08-51185

DENNIS, Circuit Judge, joined by KING, Circuit Judge, dissenting.

I respectfully dissent.

## I.

The majority's decision misinterprets and hobbles Congress's use of its enumerated and implied constitutional powers to enact the Sex Offender Registration and Notification Act (SORNA or Act) for the purpose of deterring dangerous sex offenders nationwide from moving either intrastate or interstate in evasion of SORNA registration and updating requirements to prey on children and other vulnerable sex crime victims. SORNA establishes a comprehensive federal and state legal system that, *inter alia*, requires convicted sex offenders to register, and to keep their registrations current, in each locality where they live, work, and go to school, 42 U.S.C. § 16913(a)-(c); withholds federal funds from participating jurisdictions that fail to substantially implement SORNA, *id.* § 16925(a); requires each participating jurisdiction to enact criminal penalties for the failure of a sex offender to comply with SORNA registration and updating requirements within each jurisdiction, *id.* § 16913(e); makes it a federal crime for a convicted sex offender who moves in interstate commerce and knowingly fails to abide by the Act's registration requirements, 18 U.S.C. § 2250(a)(1), (2)(B), (3); and makes it a federal crime for a person convicted as a sex offender under federal law to knowingly fail to abide by SORNA's registration and updating requirements, *id.* § 2250(a)(1),(2)(A), (3).

The question raised by Kebodeaux and the majority opinion is whether SORNA's 18 U.S.C. § 2250(a)(2)(A) can constitutionally apply to a person convicted as a sex offender under federal law, who was released from federal custody prior to the enactment of SORNA, but who knowingly failed to update his registration after an intrastate residence change, as required by SORNA subsequent to its effective date as specified by the Attorney General. 42 U.S.C. § 16913(d). The majority's answer is that SORNA's criminal, registration and

notification provisions cannot constitutionally be applied to punish a federal sex offender for his knowing failure to register or update a registration following his intrastate change of residence if he had been released from federal custody prior to SORNA's enactment on July 27, 2006.  The majority reaches this conclusion for two independent reasons:

First, although Congress undisputedly has the implied power under Article I of the Constitution to make criminal laws to govern persons in furtherance of Congress's enumerated legislative powers, *see, e.g., United States v. Comstock*, 130 S. Ct. 1949, 1957 (2010), the majority concludes that power cannot be applied to punish a federal sex offender for his knowing failure to update his intrastate residence change under SORNA if he had been released from federal custody prior to the enactment of SORNA on July 27, 2006. Applying the "*Comstock* considerations," *see id.* at 1965, the majority recognizes first that Congress has broad authority to enact legislation under the Necessary and Proper Clause, *see id.* at 1956; that a statute must constitute a means that is "reasonably adapted" to an enumerated power; that Congress has a large discretion as to the choice of such means; and that courts must apply a presumption of constitutionality to Congress's enactments.  Maj. Op. 5-6.  But the majority finds that the other "*Comstock* considerations" outweigh that presumption and show that SORNA is not reasonably adapted to Congress's undisputed Article I power to criminalize federal sex offenses because "[t]he statute's regulation of an individual, after he has served his sentence and is no longer subject to federal custody or supervision, solely because he once committed a federal crime, (1) is novel and unprecedented despite over 200 years of federal criminal law; (2) is not 'reasonably adapted' to the government's custodial interest in its prisoners or its interest in punishing federal criminals; (3) is unprotective of states' sovereign interest over what intrastate conduct to criminalize within their own borders; and (4) is sweeping in the scope of its

No. 08-51185

reasoning." Maj. Op. 19.

Alternatively, the majority concedes that Congress, under its Commerce Clause and Necessary and Proper Clause authority, may (1) "regulate the use of the channels of interstate commerce"; (2) "regulate and protect the instrumentalities of . . . or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce." Maj. Op. 20 (alteration in original) (quoting *United States v. Lopez*, 514 U.S. 549, 558-59 (1995)); *see also* Maj. Op. 20 n.38 (describing *Lopez* as "holding that because the Gun-Free School Zones Act does not fall within any of the three categories, it is an unconstitutional exercise of federal power" (citing *Lopez*, 514 U.S. 549, 558-59, 567)). But the majority finds that Congress nonetheless lacked the authority to subject federal sex offenders released prior to the July 27, 2006 enactment of SORNA's registration requirements, 42 U.S.C. §§ 16913-16916, and pertinent criminal provision, 18 U.S.C. § 2250(a)(2)(A), because they, like the statutes that were struck down in *Lopez* and *United States v. Morrison*, 529 U.S. 598 (2000), constitute regulation of only intrastate non-economic activity.

## II.

Failing to recognize that statutory interpretation is a "holistic endeavor," *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988); *accord United States v. Johnson*, 632 F.3d 912, 922 (5th Cir. 2011) (same), the majority opinion's reading of SORNA's text is incomplete and erroneous. Consequently, the majority fails to properly analyze and understand how Congress rationally and simultaneously adapted SORNA's provisions to the three constitutional powers they carry into execution: the spending power, the commerce power, and the power to enact criminal laws to further and to prevent interference with its enumerated powers. The majority totally disregards

42

No. 08-51185

Congress's use in SORNA of its enumerated power to spend federal funds for the general welfare.   Importantly, Congress used its spending power both to establish SORNA's purpose as a legitimate end of the legislation, and as one of the means, together with its Commerce Clause power and its power to legislate criminal laws to further and protect its enumerated powers, in carrying all of those powers into effect.

The majority analyzes, one at a time, only two congressional powers that SORNA seeks to execute, the Commerce Clause power and power to enact criminal laws pursuant to its enumerated powers, and finds that SORNA is not rationally adapted to execute either power.  This analysis is manifestly incorrect, however, because in SORNA, Congress plainly used three, not just two, of its constitutional powers, and it used them simultaneously, not just one at a time. In doing so, Congress reasonably adapted the SORNA provisions as the necessary and proper means of carrying all three powers into effect at the same time. The three powers are Congress's enumerated spending power, U.S. Const. art. I, § 8, cl. 1, its enumerated Commerce Clause power, *id.* art. 1, § 8, cl. 3, and its well established implied power to enact criminal laws in furtherance of its enumerated powers, e.g., to regulate commerce, to spend funds for the general welfare, to enforce civil rights, and so forth, *see Comstock*, 130 S. Ct. at 1957-58 (citing U.S. Const. art. I, § 8, cls. 1, 3, 4, 7, 9; *id.* amends. XIII-XV).  Recently, the Supreme Court recognized that SORNA uses these three powers in "seek[ing] to make the preexisting patchwork of federal and 50 individual state registration systems . . . more uniform and effective . . . by setting forth comprehensive registration-system standards; by making federal funding contingent on States' bringing their systems into compliance with those standards; by requiring both state and federal sex offenders to register with relevant jurisdictions (and to keep registration information current); and by creating federal criminal sanctions applicable to those who violate the Act's registration requirements."

No. 08-51185

*Reynolds v. United States*, 132 S. Ct. 975, 978 (2012) (citing, *inter alia*, 18 U.S.C. § 2250(a) (criminal provision), 42 U.S.C. §§ 16911(10), 16913-16916 (registration requirements), and 42 U.S.C. § 16925 (federal funding provision)).

Chief Justice Marshall famously summarized Congress's authority under the Necessary and Proper Clause in *McCulloch v. Maryland*, which has stood for nearly 200 years as the Court's definitive interpretation of that text:

> Let the end be legitimate, let it be within the scope of the constitu-
> tion, and all means which are appropriate, which are plainly
> adapted to that end, which are not prohibited, but consistent with
> the letter and spirit of the constitution, are constitutional.

17 U.S. 316, 421 (1819).  Congress's purpose in enacting SORNA is to "protect the public from sex offenders and offenders against children" by joining and unifying the states and other jurisdictions in establishing a "comprehensive national system" for registration and notification of the public by sexual offenders.  42 U.S.C. § 16901.  Thus, SORNA's purpose constitutes a legitimate end toward which a Congressional law may be directed — the spending of funds for the general welfare — and SORNA's provisions carry into execution that spending power as well as Congress's enumerated power to regulate interstate and foreign commerce and its implied power to enact criminal laws in further-ance of those enumerated powers.

The Supreme Court has also held that the Constitution "'addresse[s]' the 'choice of means  primarily . . . to the judgment of Congress.  If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone.'"  *Comstock*, 130 S. Ct. at 1957 (alter-ations in original) (quoting *Burroughs v. United States*, 290 U.S. 534, 547-48

No. 08-51185

(1934)). In my view, Congress did not abuse its discretion in enacting 42 U.S.C. § 16913 and 18 U.S.C. § 2250(a)(2)(A), as part of the interconnected and highly reticulated scheme of SORNA, in order to achieve the goal of establishing a comprehensive national system for registration of, and notification by, sex offenders.

In *Sabri v. United States*, 541 U.S. 600 (2004), the Court held that "Congress has authority *under the Spending Clause* to appropriate federal moneys to promote the general welfare, Art. I, § 8, cl. 1, and it has *corresponding authority* under the Necessary and Proper Clause, Art. I, § 8,cl. 18, to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare." *Id.* at 605 (emphases added).  Similarly, in SORNA, Congress uses its spending power to induce the states and other defined jurisdictions to join in accomplishing its purpose by providing, *inter alia*, that: a participating jurisdiction that fails to substantially implement SORNA's requirements shall not receive 10 percent of the federal  funds that would otherwise be allocated to the jurisdiction under SORNA, 42 U.S.C. § 16925(a); each jurisdiction shall maintain a jurisdiction-wide sex offender registry conforming to the require-ments of SORNA, *id.* §16912(a); each jurisdiction, other than a federally recognized Indian tribe, shall enact a criminal penalty that includes a maximum term of imprisonment that is greater than a year for the failure of a sex offender to comply with the requirements of SORNA, *id.* § 16913(e); the Attorney General shall maintain a national database at the Federal Bureau of Investigation for each sex offender and any other person required to register in a jurisdiction's sex offender registry, known as the National Sex Offender Registry, *id.* § 16919(a); and the Attorney General shall ensure (through the Registry or otherwise) that updated information about a sex offender is immediately electronically forwarded to all relevant jurisdictions, *id.* § 16919(b).  The foregoing SORNA provisions are manifestly rationally adapted to carry Congress's spending power

into execution for the legitimate purpose of establishing a comprehensive national system for the registration and notification by convicted sexual offenders to protect the public against sex offenders and offenders against children.

At the same time, in SORNA, Congress under its power to enact federal laws to criminalize conduct that would interfere with its enumerated powers, criminalized a knowing failure by a federal sex offender to register or update a registration. Thus, while Congress used its spending clause power to induce each jurisdiction to enact a criminal penalty for the failure of a sex offender to comply with the requirements of SORNA, *see* 42 U.S.C. § 16913(e), it also enacted a federal criminal law counterpart that provides that a federal sex offender who knowingly fails to register or update a registration as required by SORNA shall be fined or imprisoned not more than 10 years, or both, 18 U.S.C. § 2250(a)(2)(A). This latter provision enables the federal government to prosecute and convict federal sex offenders who knowingly fail to register, or to keep the registration current in each place where the offender resides, is an employee, or is a student, as required under § 16913(a)-(c). The states and other defined jurisdictions are enabled to prosecute and convict sex offenders who knowingly fail to comply with the requirements of SORNA under the criminal penalties the participating states and other jurisdictions are required to enact by § 16913(e). *See, e.g.,* 42 U.S.C. § 16913(c) (Every sex offender "shall, not later than 3 business days after each change of name, residence, employment, or student status, appear in person in at least 1 jurisdiction involved" and "inform that jurisdiction of all changes in the information required for that offender in the sex offender registry."). Thus, a federal sex offender, such as Kebodeaux, who fails to update his registration as required by SORNA, after changing his residence intrastate, may be prosecuted, convicted and punished for knowingly failing to abide by SORNA requirements, by either the state or the federal

government.

Section 2250(a)(2)(A) is necessary and proper to bring about parity and a consistent level of enforcement, monitoring and tracking of all sex offenders, so that laxity toward federal sex offenders does not disrupt or interfere with Congress's enumerated powers sought to be executed through SORNA. Although § 2250(a)(2)(A) overlaps with the participating jurisdictions' criminal penalties enacted pursuant to § 16913(e), Congress evidently had reason to enact a federal criminal law to further and protect its enumerated powers brought into execution by SORNA. As the Supreme Court explained in *Carr v. United States*, "it is entirely reasonable for Congress to have assigned the Federal Government a special role in ensuring compliance with SORNA's registration requirements by federal sex offenders— persons who typically would have spent time under federal criminal supervision." 130 S. Ct. 2229, 2238 (2010). Congress could reasonably expect the states to have an incentive and ability to monitor, track, and convict state sex offenders who change names, residences, employment, or schools intrastate without updating their registrations, while deeming that the federal government should take primary responsibility for deterring federal sex offenders from doing the same. After all, because federal sex offenders are identified and classified as such by virtue of their federal convictions, it is reasonable for Congress to require the federal government, rather than the participating jurisdictions, to be primarily responsible for monitoring and enforcing their registration and updating requirements under SORNA.

Congress also exercised its Commerce Clause authority to enact § 2250(a)(2)(B), which punishes sex offenders who travel in interstate commerce and evade registration requirements. No one disagrees with this use of congressional power in SORNA. Furthermore, "Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce [and] the means chosen are 'reasonably

adapted' to the attainment of a legitimate end under the commerce power." *Gonzales v. Raich*, 545 U.S. 1, 37 (2005) (Scalia, J., concurring in the judgment). Justice Scalia's view of the Necessary and Proper Clause was adopted by five additional members of the Supreme Court , the five members of the majority in *Comstock* .[1]  In *Comstock*, the Court explained that in determining whether the Necessary and Proper Clause grants Congress authority to enact a particular piece of legislation, "the relevant inquiry is simply 'whether the means chosen are "reasonably adapted" to the attainment of a legitimate end under the commerce power' or under other powers that the Constitution grants Congress the authority to implement." 130 S. Ct. at 1957 (quoting *Raich*, 545 U.S. at 37 (Scalia, J., concurring in the judgment), in turn quoting *United States v. Darby*, 312 U.S. 100, 121 (1941)).

Congress thus clearly also had the authority to enact § 16913(a)-(c), which lays out registration and updating requirements for sex offenders, and § 2250(a)(2)(A), which provides a criminal penalty for federal sex offenders who knowingly fail to comply with § 16913(a)-(c).  Congress's imposition of registration and updating requirements on federal sex offenders, even if they never move to another state, is reasonably adapted to the exercise of its powers under SORNA because it is a necessary part of the comprehensive national system of SORNA that Congress enacted.  Without uniform and consistent registration requirements, sex offenders could change their information or identity intrastate — for example, by changing their names or residences — decline to register such changes, and subsequently feel able to commit sex crimes  and/or move to another state undetected.  In so doing, they would undermine Congress's goal of

---

[1] In declining to join the majority in *Comstock*, Justice Scalia did not question his prior reasoning regarding the Necessary and Proper Clause; rather, he  joined Justice Thomas's dissent in *Comstock* on the ground that the statute at issue did not effectuate Congress's exercise of an enumerated power.  *See Comstock*, 130 S. Ct. 1949, 1970 (Thomas, J., dissenting).

establishing a nationwide, comprehensive scheme for tracking the whereabouts of sex offenders.  The reasoning of other courts of appeals in cases dealing with state sex offenders is equally applicable to federal sex offenders.  *See United States v. Howell*, 552 F.3d 709, 717 (8th Cir. 2009) ("Although § 16913 may reach a wholly intrastate sex offender for registry information, § 16913 is a reasonable means to track those offenders if they move across state lines.  In order to monitor the interstate movement of sex offenders, the government must know both where the offender has moved and where the offender originated. Without knowing an offender's initial location, there is nothing to ensure the government would know if the sex offender moved.  The registration requirements are reasonably adapted to the legitimate end of regulating 'persons or things in interstate commerce' and 'the use of the channels of interstate commerce.'" (quoting *United States v. May*, 535 F.3d 912, 921 (8th Cir. 2008), in turn quoting *Lopez*, 514 U.S. at 558-59) (internal quotation marks omitted)); *accord United States v. Guzman*, 591 F.3d 83, 89-91 (2d Cir. 2010) ("Requiring sex offenders to update their registrations due to intrastate changes of address or employment status is a perfectly logical way to help ensure that states will more effectively be able to track sex offenders when they do cross state lines. To the extent that § 16913 regulates solely intrastate activity, its means 'are "reasonably adapted" to the attainment of a legitimate end under the commerce power,' and therefore proper." (quoting *Raich*, 545 U.S. at 37 (Scalia, J., concurring in the judgment))); *cf. United States v. Pendleton*, 636 F.3d 78, 87 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1290 (2012) (same). Section 2250(a)(2)(A) gives the federal government the complementary power to enforce SORNA's registration and updating require-ments against federal sex offenders and thus reasonably adapts Congress' commerce clause power  to effectuate Congress's  purposes in enacting SORNA. And, as already explained, "it is entirely reasonable for Congress to have assigned the Federal Government a special role in ensuring compliance with

No. 08-51185

SORNA's registration requirements by federal sex offenders — persons who typically would have spent time under federal criminal supervision." *Carr,* 130 S. Ct. at 2238.

In sum, Congress could reasonably conclude that 18 U.S.C. § 2250(a)(2)(A) and 42 U.S.C. § 16913 (a)-(c) were "convenient, or useful" or "conducive" to the "beneficial exercise," *McCulloch*, 17 U.S. at 413, 418; *see also id.* at 421, of its legislative power, were means rationally adapted to the attainment of a legitimate end— a national comprehensive system for registering, updating, and tracking sex offenders—under the commerce power, the spending power, or under other powers that the Constitution grants Congress the authority to implement. *Comstock*, 130 S. Ct. at 1957 (citing *Raich*, 545 U.S. at 37 (Scalia, J., concurring in the judgment), in turn quoting *Darby*, 312 U.S. at 121).

## III.

The majority is also clearly in error in concluding that SORNA's provisions do not apply retroactively to Kebodeaux because he served his sentence before the enactment of SORNA on July 27, 2006. Quite to the contrary, the Act authorized the Attorney General to specify the applicability of its requirements to sex offenders convicted before its enactment. 42 U.S.C. § 16913(d); *see United States v. Johnson*, 632 F.3d 912, 922 (5th Cir. 2011) ("When SORNA was enacted, Congress elected not to decide for itself whether the Act's registration requirements — and thus § 2250(a)'s criminal penalties—would apply to persons who had been convicted of qualifying sex offenses before SORNA took effect. Instead, Congress delegated to the Attorney General the authority to decide that question."). On February 28, 2007, the Attorney General issued an interim regulation stating that SORNA's requirements "apply to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act." Applicability of the Sex Offender Registration and Notification Act, 72 Fed. Reg. 8894, 8897 (Feb. 28, 2007); (codified at 28

No. 08-51185

C.F.R. § 72.3). Neither SORNA nor the Attorney General's interim regulation provides any exception for released pre-act federal offenders from the retroactive application of SORNA's registration and notification requirements.

Not only does the plain language of SORNA and the Attorney General's interim regulation make SORNA's requirements retroactively applicable to Kebodeaux and all other sex offenders, regardless of the dates of their convictions or releases from custody, our prior decisions have consistently upheld SORNA against similar challenges and arguments. In *Johnson*, we reaffirmed our holdings in *United States v. Whaley*, 577 F.3d 254, 260-64 (5th Cir. 2009), that SORNA does not violate due process, exceed Congress's authority under the Commerce Clause, or exceed the non-delegation doctrine; and our holding in *United States v. Young*, 585 F.3d 199, 206 (5th Cir. 2009), that SORNA does not violate the Ex Post Facto Clause. Also, in *Johnson* itself, we rejected a challenge to the validity of the Act and the decision of the Attorney General to apply it to persons whose convictions for sex crimes predate its enactment, holding that SORNA does not violate the Tenth Amendment, and that the Attorney General's failure to comply with Administrative Procedure Act procedures prior to promulgation of the interim rule was harmless. 632 F.3d at 930-33.

## IV.

In summary, after agreeing with this courts' prior decisions upholding SORNA against Ex Post Facto, Due Process, Tenth Amendment, and other attacks, the majority opinion offers no valid reason that SORNA is not a reasonable adaptation of Congress' spending power, commerce power, and power to enact criminal laws to further and protect its enumerated powers, for the legitimate end of establishing a comprehensive national sex offender registration and notification system. Accordingly, in my view, SORNA is not unconstitutional as applied to Kebodeaux.

For these reasons I respectfully dissent.

No. 08-51185

HAYNES, Circuit Judge, joined by KING, DAVIS, STEWART, and SOUTHWICK, Circuit Judges, dissenting:

I respectfully dissent. I would affirm Kebodeaux's conviction.

## I. *The Original Challenge*

I begin by addressing what we need no longer consider—a facial challenge to Section 2250(a)(2)(A)'s constitutionality. In the district court, Kebodeaux brought a broad-based challenge to Congress's power to enact this section at all, largely focused on Commerce Clause concerns. Before the original panel, though mentioning the impact on him, Kebodeaux again largely confined his analysis to the overall alleged unconstitutionality of this section discussing both the "necessary and proper" basis and the Commerce Clause basis. His broad assertions that Congress lacked power to provide civil collateral consequences for federally-convicted offenders engendered the panel majority's analysis of this power. Only in supplemental briefing before the en banc court did Kebodeaux's argument begin to crystallize "solely" into an "as applied" challenge. Indeed, it was not until oral argument before the en banc court that Kebodeaux's attorney finally conceded that Section 2250(a)(2)(A) could be constitutional "as applied" to certain classes of offenders, just not Kebodeaux, i.e., that Congress has a federal interest in the civil collateral consequences of federal offenses even when those civil consequences are not imposed as part of the original sentence for the offense.

The majority opinion continues in this vein, all but conceding that § 2250(a)(2)(A) is facially constitutional and declining to strike it down in its entirety, as Kebodeaux originally sought so long ago in district court. Maj. Op. at 3. Therefore, while I continue to stand by the panel majority opinion, 647 F.3d 137 (5th Cir.), *vacated*, 647 F.3d 605 (5th Cir. 2011), I will not reprise it here (or further address the disagreements with it articulated by the majority

opinion) beyond that necessary to address all that is left of the case—the as applied challenge centered on Kebodeaux.  In doing so, however, I note the jurisprudential problems posed by an argument that changes from district court to panel to en banc and the relative lack of utility in deciding Kebodeaux's case alone (not to mention the "narrow" group[1] in which he falls) as an en banc court. Respecting the right of my colleagues to address the present argument alone as an en banc court, I address the "as applied" argument below.

## II. *Section 2250(a)(2)(A) is Constitutional As Applied to Kebodeaux*

### A. The Analytical Process

Any discussion of the constitutionality of a statute must begin with the presumption of its constitutionality.  *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 608 (2000).  As the majority opinion notes, the analysis "always starts with a heavy thumb on the scale in favor of upholding government action." Maj. Op. at 7.  The basic analysis focuses on whether the challenged statute "constitutes a means that is rationally related to the implementation of a constitutionally enumerated power," *United States v.* Comstock, 130 S. Ct. 1949, 1956 (2010) (citing *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819), and *Sabri v. United States*, 541 U.S. 600, 605 (2004)); and, that the statute must reflect a "'means . . . 'reasonably adapted' to the attainment of a legitimate end under'" an enumerated power, *id.* at 1957 (quoting *Gonzales v. Raich*, 545 U.S. 1, 37 (2005) (Scalia, J. concurring)); *see also id.* at 1961 ("Moreover, § 4248 is 'reasonably adapted' to Congress' power to act as a responsible federal custodian (a power that rests, in turn, on federal criminal statutes that legitimately seek to implement constitutionally enumerated authority)." (citation omitted)).

Starting with a presumption of constitutionality, Congress has "broad

---

[1] As posited by the majority opinion, this "narrow group" presumably consists of federal sex offenders released from prison and supervised release before SORNA's enactment who do not travel in interstate commerce after its enactment.

authority" to enact laws that are rationally related to enumerated powers. *Id.* at 1957. The majority opinion is right to distinguish this inquiry from due process and equal protection rational-basis scrutiny, but that distinction by no means lowers the high hurdle that Kebodeaux faces. *See id.* ("'The Constitution . . . leaves to Congress a large discretion as to the means that may be employed in executing a given power.'" (quoting *Lottery Case*, 188 U.S. 321, 355 (1903))); *see also Morrison*, 529 U.S. at 607 ("[Courts may] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds."). Further, the *Comstock* Court outlined the sometimes distant and indirect relationship between an enumerated power and a properly enacted statute implemented in furtherance of the Necessary and Proper Clause:

> Neither Congress' power to criminalize conduct, nor its power to imprison individuals who engage in that conduct, nor its power to enact laws governing prisons and prisoners, is explicitly mentioned in the Constitution. But Congress nonetheless possesses broad authority to do each of those things in the course of "carrying into Execution" the enumerated powers "vested by" the "Constitution in the Government of the United States," Art. I, § 8, cl. 18—authority granted by the Necessary and Proper Clause.

130 S. Ct. at 1958. This statement provides the framework for any Necessary and Proper Clause analysis.

With this general background in mind, I turn to the matter at hand. Perhaps much of the disagreement between the majority opinion and the panel majority opinion is in the framing of the issue. The majority opinion posits that Congress in enacting Section 2250(a)(2)(A), and the Government in prosecuting Kebodeaux under it, seek to "assert unending criminal authority" over convicted federal sex offenders. If this premise were true, I would agree with the majority opinion that Congress has exceeded its authority—albeit under the Ex Post Facto Clause. However, because SORNA's registration requirements are civil in nature, as the majority opinion itself notes repeatedly (*see, e.g.*, Maj. Op. at

9 n.17), Congress appropriately exercised its power to prescribe civil collateral consequences of a federal crime pursuant to the Necessary and Proper Clause.

## B. Even under the Majority Opinion's Test, Kebodeaux's Conviction is not Unconstitutional

The thrust of the majority opinion's analysis focuses on the "jurisdictional hook" needed for Congress to impose civil registration requirements on a prisoner convicted of a federal crime. The majority opinion concedes that Congress may place conditions on a federal prisoner's release from custody, or even impose sex-offender registration requirements on anyone under federal government supervision, even if those requirements were not expressly included as part of the prisoner's sentence. When a federal prisoner, however, is "unconditionally released," the majority opinion posits that the federal government forfeits its ability to impose civil collateral consequences for that federal crime, here, molesting a young teenager. Therefore, the majority reasons that because Kebodeaux was "unconditionally released" prior to SORNA's enactment, Congress has no authority to require him to register under the Act. Ultimately, the majority opinion contends that "SORNA's registration requirements are civil *and were enacted* after Kebodeaux committed his crime," Maj. Op. at 11 (emphasis added), and that Congress cannot "pass a law to protect society from someone who was once in prison but seven years ago had fully served his sentence and had not since been in contact with the federal government." Maj. Op. at 12. In other words, Congress must "strike while the iron is hot."

Assuming arguendo that the majority opinion's premise is correct—that Congress must enact a civil collateral consequence statute while the particular federal offender regulated is still within the federal government's grasp—Congress did so. The federal government seized and never relinquished its registration authority over Keboeaux from 1999 to the present. As the

No. 08-51185

majority opinion concedes, "federal law relating to sex-offender registration [has existed] since 1994." Maj. Op. at 9. All agree that Kebodeaux was convicted in 1999 of a crime committed that same year. Thus, to the extent Congress must strike while the iron is hot, I will next examine how it did so.

The premise of the majority opinion's jurisdictional analysis stems from the fact that SORNA was implemented after Kebodeaux's release, allegedly leaving a gap in jurisdiction that prevents the federal government from regulating civil consequences of his conviction pursuant to the Necessary and Proper Clause. The majority opinion and Kebodeaux (through concessions by counsel at oral argument) agree, however, that if SORNA had been implemented while Kebodeaux was in custody or subject to supervised release, then this argument would not apply.

Kebodeaux was, in fact, continuously subject to federal registration authority from the time of his release through SORNA's inception (and thereafter).[2] In 1994, Congress enacted the Wetterling Act, which subjected certain sex offenders to registration requirements through a state-based registration system. *See* 42 U.S.C. § 14071, *repealed by* SORNA § 129, Pub. L. 109-248, § 129, 120 Stat. 600 (2006). The Wetterling Act required states to meet minimum requirements in order to receive federal criminal justice funds. *Id.* In 1996, Congress enacted the Pam Lychner Act, which retained the Wetterling Act's minimum ten-year registration requirement for sex offenders but expanded lifetime registration requirements to a broader swath of offenders. *See id.* §

---

[2] Pertinent to the conviction from this appeal is taken, Kebodeaux was aware at the time in question of the need to register as a sex offender and does not contend confusion about the need to do so after SORNA's passage. Nor does he contend some inability to comply. In this case, he stipulated that he moved from San Antonio, Texas to El Paso, Texas in August of 2007 and reported to the El Paso police department to file the necessary registration forms. At that time, he acknowledged knowledge of the registration requirements. Thereafter, he moved back to San Antonio without re-registering. That failure to register triggered the prosecution underlying this conviction.

14072, *repealed by* SORNA. The Lychner Act also enhanced federal involvement in the registration process, creating a national database designed to allow the FBI to track registrants and to provide a mechanism for registration where offenders resided in states that chose not to comply with the Wetterling Act. *Id.* In addition, the Lychner Act created a federal criminal penalty for certain offenders' failure to register. *Id.* § 14072(i); Wayne A. Logan, *Criminal Justice Federalism and National Sex Offender Policy*, 6 OHIO ST. J. CRIM. L. 51, 72 (2008); *United States v. Smith*, 481 F. Supp. 2d 846, 847-51 (E.D. Mich. 2007) (concluding that although § 2250 did not apply to a defendant's pre-SORNA offense, defendant was subject to federal misdemeanor for failing to register pursuant to the Lychner Act).[3] The next year, the Jacob Wetterling Improvements Act extended registration requirements to certain federal and military offenders. *See* Pub. L. No. 105-277, 112 Stat. 2440; 42 U.S.C. § 14072(i).

In 1999, Kebodeaux was convicted under Article 120 of the United States Code of Military Justice for one count of carnal knowledge involving a minor. This offense invoked the Lychner Act's federal registration requirement. Section 14072(i) required registration by any person "described in section 4042(c) of title 18." 42 U.S.C. § 14072(i)(3) (effective Oct. 21, 1998 to July 26, 2009). Section 4042(c) included persons convicted of an "offense designated by the Attorney General as a sexual offense for purposes of this subsection." 18 U.S.C. §

---

[3] *See also United States v. Torres*, 573 F. Supp. 2d 925, 932 (W.D. Tex. 2008) ("While the Act primarily was regulatory in nature, similar to SORNA, the Wetterling Act also provided criminal penalties of up to one year for a first offense, and up to ten years for subsequent offenses, for sex offenders who failed to register in any state they resided, worked or were a student."); *United States v. Hinen*, 487 F. Supp. 2d 747, (W.D. Va. 2007) ("The Jacob Wetterling Act of 1994 directly imposes registration requirements on certain classes of sex offenders, and the defendant is included within this class. . . . Regardless of the applicability of SORNA to the defendant, as of the dates in question, the nature of his conviction required him, under a long-standing federal law, to register in his state of residence and any other state where he was employed, carried on a vocation, or was a student."), *reversed on other grounds by United States v. Hatcher*, 560 F.3d 222 (4th Cir. 2009).

No. 08-51185

4042(c)(4)(E), *repealed by* SORNA (effective through July 27, 2006). Accordingly, the Attorney General designated as a sexual offense for purposes of § 4042(c), the military sex offense that Kebodeaux later committed: "Uniform Code of Military Justice . . . 120B1/2 (Carnal knowledge)." 28 C.F.R. § 571.72(b)(2); *see Designation of Offenses Subject to Sex Offender Release Notification*, 63 Fed. Reg. 69,386 (Dec. 16, 1998).[4]

Regardless of the state in which Kebodeaux chose to reside after his release, he was required to register for at least ten years. If he lived in a state that complied with the Wetterling Act's minimum requirements, then Kebodeaux was required to register with that state. *See* 42 U.S.C. §§ 14071(b)(6)-(7), 14072(i)(3).[5] If, however, he lived in a state that was not minimally compliant, Kebodeaux was required to register with the FBI. *Id.* § 14072(c)-(d), (g)(2), (i). At the time of his original conviction, Kebodeaux's "fail[ure] to register in [the] State in which [he] reside[d]," (or with the FBI, if he was in a non-minimally compliant state) was punishable for a first offense, of imprisonment "for not more than 1 year[6] and, in the case of a second or subsequent offense under [14072(i)], . . . not more than 10 years." *Id.* § 14072(i)(1),(3)-(4); *see United States v. Mantia*, No. 07-60041, 2007 WL 4730120,

---

[4] The Department of Justice's guidance on sex-offender release notification designated "UCMJ offenses . . . [to make] clear that persons convicted of military offenses in pertinent categories are persons described in 18 U.S.C. § 4042(c)(4) for all purposes, including post-release change of address notice by federal probation officers for persons under their supervision pursuant to section 4042(c)(2)." 63 Fed. Reg. 69,386.

[5] 42 U.S.C. § 14071(b)(7) required "minimally compliant" states to establish procedures to accept registration information from residents convicted of federal offenses.

[6] Based on this section, the concurring opinion filed by Judge Owen suggests that the sentence was unconstitutional. In the briefing before our court, Kebodeaux has never separately challenged his sentence; instead, he has sought only vacatur of his conviction. This is probably because by the time his appellate brief was filed, he had already been released from confinement such that any appeal of the sentence of confinement is moot. *United States v. Rosenbaum-Alanis*, 483 F.3d 381, 382 (5th Cir. 2007).

No. 08-51185

*1, 6 n.5 (W.D. La. Dec. 10, 2007) (unpublished).[7]

The Wetterling and Lychner Acts were folded into and repealed as stand-alone acts on July 27, 2006,[8] in an effort to further expand and unify national sex registration requirements. *Reynolds v. United States*, 132 S. Ct. 975, 978 (2012).[9] Until SORNA's implementation (and continuing thereafter), Kebodeaux had been continuously subject to federal registration requirements of some sort. Though Kebodeaux challenges SORNA, using the majority opinion's reasoning, the federal government never gave up—or lost—its "jurisdictional hook" over Kebodeaux. The majority opinion's reasoning is based on a straightforward syllogism: The federal government loses its right to enact civil collateral consequences over a federal inmate once the inmate is unconditionally released from its supervision; Kebodeaux was released from prison before SORNA's enactment; thus, the federal government no longer had federal jurisdiction over Kebodeaux when it convicted him for failing to register under SORNA. Even if we assume for the sake of argument that the majority opinion's jurisdictional premise is correct, Congress exercised "jurisdiction" over Kebodeaux while he was still subject to federal restrictions. That one statute has been folded into

---

[7] The majority opinion's contention that Kebodeaux's residence in a minimally compliant state immunized him from federal requirements is incorrect. Maj. Op. at 4 n. 4. Whether a state was minimally compliant or not affected *where* Kebodeaux was to register but not *whether* he had to register. Therefore, Kebodeaux's location in a minimally compliant state did not impact the fact that he was subject to federal penalties for failure to register. *See* 42 U.S.C. § 14072(i)(3) (applying a federal penalty to particular federal offenders that "knowingly fail[] to register in *any State* in which the person resides . . ." (emphasis added)).

[8] The Adam Walsh Act made clear, however, that the effective date of the repeal of predecessor registry programs would not take effect until at least July 27, 2009. *See* Pub. L. 109-248, §§ 124, 129, 120 Stat. 598, 600-01; *see also* Guidelines for Sex Offender Registration and Notification, 73 Fed. Reg. 38030, 38035 (July 2, 2008) (noting that the Wetterling Act would be repealed "upon completion of implementation period for SORNA").

[9] *Reynolds* addressed the narrow question of when and how SORNA's particular requirements become effective as to persons who committed their offense prior to its enactment. It does not address Congress's power to prescribe registration requirements for those offenders.

another does not alter this assertion of civil "power" and "jurisdiction" over Kebodeaux as a convicted federal sex offender. Kebodeaux was always required to register under federal law; the federal government never gave up its "federal" interest in Kebodeaux as a convicted federal sex offender.

It is undisputed that SORNA revamped prior federal registration requirements. *Reynolds*, 132 S. Ct. at 978. SORNA is a broader scheme that applies to a greater number of sex offenders than the prior Acts. *See* 42 U.S.C. § 16911(5)-(8).[10] In passing it, Congress sought to make prior sex offender registration schemes "more comprehensive, uniform, and effective." *Carr v. United States*, 130 S. Ct. 2229, 2232 (2010). SORNA thus mandates more comprehensive registration information and stringent check-in protocols. *See id.* § 16914. Moreover, prior to SORNA's passage, initial violations of federal registration requirements only constituted a misdemeanor offense, *see* 42 U.S.C. § 14072(i), while SORNA makes failure to register a felony punishable by up to ten years in prison, *see* 18 U.S.C. § 2250. Undoubtedly, then SORNA made important changes to the scheme previously in place.

For purposes of addressing the majority opinion's analysis, however, SORNA's broad applicability compared to prior law is of no relevance. If this challenge is "as-applied," as Kebodeaux now asserts, then the crux of the matter as defined by the majority opinion is whether the federal government had asserted jurisdiction to require civil registration over Kebodeaux as a convicted federal sex offender when it had him in its grasp, not whether the two statutes

---

[10] SORNA was enacted to create a "comprehensive national system for the registration of sex offenders by creating a new set of standards for the states' Megan's Laws and imposing registration obligations on sex offenders. The SORNA reforms were designed to 'close potential gaps under the old law, and generally strengthen the nationwide network of sex offender registration and notification programs.'" *United States v. Simington*, 2011 WL 145326, at *3 (W.D. Tex. Jan. 14, 2011) (internal citations omitted). Assuming arguendo the correctness of the majority's analysis, the situation might be different if Kebodeaux fell in one of those "gaps" pre-SORNA that was filled by SORNA. But that's not the case.

are exactly congruent.[11]   Because Kebodeaux was indeed subject to federal registration requirements at the time of his release from prison under the Wetterling and Lychner Acts and thereafter under SORNA, the "jurisdictional hook" is not an issue.  It makes little sense to contend that Congress lost its power or "jurisdictional hook" over Kebodeaux simply because it updated the national sex-offender registration system laws.

I see no reason to distinguish the jurisdiction (as a matter of federal power) exercised over Kebodeaux under SORNA from that exercised under its predecessor sex offender registry laws that applied to Kebodeaux.  Therefore, if we are to assume that Kebodeaux's conviction would be constitutional had SORNA been enacted while he was in prison or on supervised release, then his conviction is constitutional given the continuous federal jurisdiction Congress exercised over Kebodeaux from the time he committed his original sex crime, through his imprisonment, at the time of his release, through SORNA's passage, and to the present day.

In sum, Congress did "strike while the iron was hot," at least as to federal sex offender Kebodeaux, who was convicted when SORNA's predecessors were in place and imposed the basic requirement to register as to which Kebodeaux later ran afoul.  Kebodeaux's "as-applied" challenge, therefore, should fail, and the conviction should be affirmed.  From the majority opinion's failure to do so, I respectfully dissent.

---

[11]   Again assuming arguendo the validity of the majority opinion's analysis, the situation could be different if SORNA had fundamentally altered Kebodeaux's requirements by imposing some brand new obligation fundamentally different from registration.  But Kebodeaux's basic requirement of registration stayed the same.